OPINION OF THE COURT
Wachtler, J.
The defendant has been convicted of felony murder for causing the death of Eileen Byrne during the course of a rape. The crime was committed on October 22, 1970. The defendant was arrested and charged with the offense on May 9, 1974. He was tried and found guilty by a Suffolk County iury in September, 1975.
After his arrest in 1974 the defendant made a confession. Prior to trial he moved to suppress claiming that the confession was involuntary and had been obtained in violation of his right to counsel. During the hearing evidence was introduced indicating that within two weeks of the girl’s death the police had determined that the defendant was responsible; that no additional evidence was obtained after February, 1971, but that the case was kept open and no charge was made until after the defendant had served his sentence on another homicide, also committed in the fall of 1970. At the conclusion of the hearing the defendant moved to dismiss the indictment on the ground that the delay in the prosecution violated his right to due process of law. The trial court denied both motions and, following defendant’s conviction, the Appellate Division affirmed.
*245 On this appeal the defendant claims that the pretrial motions should have been granted. He argues that the indictment should be dismissed, or, in the alternative, that his confession should be suppressed and a new trial granted.
Initially it should be emphasized that the evidence concerning the delay in prosecution, and the reason for the delay, emerged during a suppression hearing. The evidence concerning the delay was of secondary importance in that proceeding and was never as fully developed as it might have been if the motion to dismiss had preceded the hearing. In addition it is noted that, at the hearing, the parties’ arguments regarding the need to defer the prosecution for further investigation or questioning were, in most respects, contrary to arguments made on the motion to dismiss and on this appeal.
The defendant’s main point at the suppression hearing was that the police had beaten him in order to obtain the confession. He also urged that they had questioned him without the aid of counsel he had initially retained in 1970 to represent him on various homicide charges or investigations, including the Byrne killing. Part of his argument rested on the theory that the police had a motive to obtain a confession at all costs because prior to his arrest in 1974 they did not have sufficient evidence to obtain a conviction. The investigating officers, however, took the position that they had no need for the confession because they had sufficient evidence to arrest and charge the defendant with the death of Eileen Byrne long before his arrest in 1974.
The testimony at the hearing shows that on October 22, 1970 the partially clad body of a 17-year-old high school girl, identified as Eileen Byrne, was discovered in an abandoned garage in Suffolk County. The body was found by a patrolman investigating a report that a blue car had been observed in the garage. Investigators at the scene discovered metallic blue paint scrapings on the white woodwork at the entrance of the garage. Samples were sent to the police lab for analysis.
On October 30, 1970 Glen Patton was shot to death in Suffolk County. On November 4, 1970 detectives from the Suffolk County Homicide Squad arrested the defendant and charged him with the Patton killing. At the police station one of the officers noticed that the defendant’s car fitted the description of the vehicle sought in connection with the Byrne homicide. A patch on the car appeared to have been recently refinished with spray paint. The detective also noted that the *246 defendant resided on the same street as the Byrne family. The police called the defendant’s employer and learned that he had not reported to work on the date of Eileen Byrne’s death.
The police then returned to the room where the defendant was being held; confronted him with the crime scene photographs of Eileen Byrne’s body and said "Ray we know you killed the girl. You want to tell us about it?” At this point the defendant began to sob and then lapsed into a "trance”. A police surgeon was summoned, and diagnosed the defendant’s condition as a hysterical reaction. At the hearing the doctor stated this might indicate guilt, but might also be the reaction of. an innocent man graphically accused of a "gruesome” crime. The defendant was removed to a hospital, and later to a mental institution where he remained for several days. On the day following his arrest the police went to the institution and asked the defendant how he felt. The defendant responded "I know you know about the guy and the girl”, and once again lapsed into a trance.[1]
After the defendant’s arrest on November 4, 1970, a witness identified the defendant’s car as the one he had seen Eileen Byrne enter on October 22. He also recalled part of the license plate number. The police searched the car and submitted certain items for laboratory analysis. Paint chips and tire impressions taken from the car were found to match those at the scene of the crime. Hair and blood, also discovered in the car, were found to match the victim’s. A can of spray paint was recovered from the trunk. Loose hairs found on the victim were matched with samples taken from the defendant.
Apparently the laboratory reports were completed before the end of 1970. All four members of the homicide squad who appeared at the hearing testified that the Byrne case was considered "solved” in 1970 after the defendant’s arrest for the Patton killing. They felt there was sufficient evidence to arrest and charge the defendant with the girl’s death. Two of them had no idea why this was not done. One of them, Detective Halverson, was "vaguely aware that it was decided to leave the investigation opened at the time that Raymond Singer went to jail” on the Patton charge. However, as far as *247 he knew, the investigation was only "opened in the sense that we did not place somebody under arrest.”
Detective Diaz, the officer in charge of the Byrne case, testified that "It was felt at that time [Nov. 4, 1970], and after communications between my superiors and the District Attorney’s office, that we did have a good circumstantial case and that we might in fact further the case by further investigation, to see if we can uncover any new evidence which might be helpful in the case.” At another point he stated that "it was mutually agreed upon, that considering the fact that Raymond Singer was not only suspect in Eileen Byrne, he was also suspect in another double homicide, that a further investigation might be helpful in resolving that one, also.” Diaz did not participate in this decision and he could not recall who had made it. The agreement, he stated was simply "to further the investigation”, that is, "To look into certain areas, to reinterview certain people, to try to interview Raymond Singer.” No decision was made with respect to the defendant’s arrest. And although Diaz had never been told that he should not arrest the defendant, he insisted that the decision was out of his hands.
In early 1971 Diaz went back over the case; reinterviewed certain witnesses and finally tried to question the defendant while he was in the Suffolk County jail awaiting disposition of the Patton indictment. The defendant however refused to talk to him. It was stipulated at the hearing that the investigation uncovered no evidence after February, 1971.
Following the defendant’s arrest in November, 1970 his family retained an attorney, named Lombardi, to represent him on the Patton indictment and the other crimes he was suspected of, including the Byrne homicide. Lombardi attempted to negotiate a plea which would cover these other crimes, but, as noted, the prosecutor refused the offer. Significantly the prosecutor testified at the hearing that he told Lombardi that he refused the offer because "it would be impossible to dispose of any matters upon which he [the defendant] was not indicted. ” (Emphasis added.)
In April, 1971 the defendant pleaded guilty to manslaughter in satisfaction of the Patton indictment. In May he was sentenced to an indeterminate term with a maximum of 10 years.
The defendant remained in State prison until October 30, 1973 when he was released on parole. During the years of the *248 defendant’s imprisonment, Diaz kept a folder on him and "on occasion” he had "done some work on it.” He described this as "minor things” and said that "nothing substantial” was developed. In fact he said that the only thing that remained to be done was to arrest the defendant. But he was not arrested because he "was already in prison * * * [and] there appeared to be no rush to arrest him.” He said that waiting for the defendant to be released from prison "seemed like a logical thing to do.” Diaz realized that he could have filed a detainer warrant or employed "a number of options”, but claimed that the decision to wait had been made by his superiors and members of the District Attorney’s office whose names he could not recall. Following this advice he did little more than contact the prison periodically to determine when the defendant would be released.
In April, 1974 Diaz learned that the defendant had been on parole for six months. Diaz and several of his superiors then met with Patrick Henry, from the District Attorney’s office. Henry testified that he had not previously been involved with the Byrne homicide. But when the police informed him of the evidence against the defendant he advised them that there was sufficient proof to make an arrest and also "to prevail in court.” As a result of that meeting the decision was made to arrest and charge the defendant.
In the latter part of April, Diaz contacted the defendant’s parole officer and attempted to arrange to talk with the defendant at the parole offices. But the plan was abandoned when the parole officer informed Diaz that he would have to obtain the defendant’s consent in advance of the meeting.
During the first week in May, Diaz learned that another officer, named Kirk, was investigating a complaint, made by the defendant’s uncle, that the defendant and his father had removed or stolen certain machinery from the family business. Kirk had requested the defendant to come to the police station to discuss the matter and Diaz asked Kirk to let him know if the defendant appeared. The defendant reported to Kirk at approximately 10:30 on the morning of May 9, 1974 and soon thereafter members of the homicide squad arrested him and charged him with murdering Eileen Byrne.
The defendant was advised of his rights and questioned regarding the girl’s death. For the first two hours he denied knowing her. Then, about 1:30 in the afternoon, he admitted picking her up while she was hitchhiking. By 3 o’clock he had *249 signed a full confession which, according to his testimony at the hearing, had been beaten out of him.
Approximately one hour later the police issued a press release reporting the defendant’s arrest. Several hours later a reporter, seeking information, called Lombardi because the newspaper files indicated that he had represented the defendant after his arrest in 1970. Lombardi had not been aware of the defendant’s arrest but he immediately went to the police station and spoke with the defendant. He also represented him at his arraignment the next morning.
Lombardi testified that he was the defendant’s lawyer from November, 1970 until August, 1974 when other counsel was appointed. Although he had not represented the defendant on his appeal from the Patton conviction, he remained the defendant’s attorney on the other homicides which were still under investigation in 1971. He admitted that he had little contact with the defendant while he was in prison, but he had continued to represent him when necessary. For instance, he had negotiated with the police and a finance company to arrange the release of the defendant’s car which, as noted, had been seized and searched in connection with the Byrne homicide. He also stated that a large portion of his fee for prior services was still unpaid when the defendant was arrested in 1971.
During oral argument at the conclusion of the hearing the defendant claimed that he had been denied due process of law because of the delay in commencing the prosecution. The court agreed that the issue had been raised by the testimony at the hearing. The defendant was permitted to submit a written motion to dismiss, which would be decided in conjunction with the motion to suppress. As indicated, both motions were subsequently denied.
The court rejected the defendant’s claim that the confession had been involuntarily made as a result of a beating. That determination is not challenged on this appeal. The court also found that the defendant "was not represented by an attorney at the time of his arrest on May 9,. 1974, as the record clearly established Mr. Lombardi’s discharge in 1971. The record further clearly established the defendant’s voluntary waiver of his Miranda rights which rendered the assertion of Mr. Lombardi’s purported continuing status as defendant’s attorney academic. 'The assertion that once an attorney appears there can be no effective waiver unless made in the presence of the *250 attorney is merely a theoretical statement of the rule. This dogmatic statement is not the New York law’ (People v Robles, 27 NY2d 155).”
With respect to the motion to dismiss the court held that the defendant had not been prejudiced by the 42-month delay. Although the defendant claimed that the failure to formally charge him with the Byrne homicide at the time of the Patton plea deprived him of the opportunity of entering a plea to both indictments and serving a concurrent sentence, the court found that this was speculative.
The Appellate Division affirmed concluding that the delay was justified by the need to investigate the crime. They held that although all the evidence was actually obtained by May of 1971, and the investigating officers felt that there was sufficient evidence to arrest and charge the defendant at that time, "their superiors and the District Attorney apparently thought otherwise, and directed that there be further investigation.” The Appellate Division also found no merit to the defendant’s claim of prejudice with respect to a concurrent sentence. They concluded that this was contradicted by the evidence since the prosecutor testified that he had refused to dispose of the Byrne homicide as part of the Patton plea. They neglected to note, however, that the prosecutor also testified that the rejection was based on the fact that the defendant had not been formally charged with the Byrne homicide at the time they negotiated the plea to the Patton indictment.
The motion to suppress the defendant’s oral and written confessions should have been granted. The evidence at the hearing established that counsel was initially retained, in 1970, to represent the defendant on several matters, including the Patton indictment and the Byrne homicide. Indeed the Assistant District Attorney who represented the People on the Patton indictment and later handled the prosecution of the Byrne charges testified that the defendant’s attorney repeatedly, although unsuccessfully, offered to negotiate a plea that would include all crimes of which the defendant was charged or suspected. The prosecutor specifically recalled that the Byrne homicide was discussed during these conferences.
As indicated the hearing court found that the defendant was not represented by counsel when he was arrested and interrogated on May 9, 1974 because he had discharged Mr. Lombardi in 1971. The record, however, simply indicates that after the defendant pleaded guilty to the Patton indictment *251 another attorney was appointed to represent him on the appeal from that conviction. There is no evidence that counsel had been discharged on the Byrne matter which was still unresolved at the time the defendant pleaded guilty to the Patton indictment. On the contrary, Mr. Lombardi himself testified that he had not been discharged as defendant’s attorney on the Byrne homicide, which is confirmed by his immediate appearance at the police station after being informed of the defendant’s arrest on May 9, 1974. In short the evidence is insufficient, as a matter of law, to sustain the hearing court’s finding that the attorney, retained to represent the defendant on the Byrne case, had been discharged prior to the defendant’s arrest and interrogation in May of 1974.
 The hearing court’s additional, or alternative, holding that the "defendant’s voluntary waiver of his Miranda rights * * * rendered the assertion of Mr. Lombardi’s purported continuing status as defendant’s attorney academic”, was expressly based on People v Robles (27 NY2d 155), which was later overruled in People v Hobson (39 NY2d 479). In Hobson we held (at p 481) that "Once a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer”. This is the rule applicable on this appeal (see, e.g., People v Macedonio, 42 NY2d 944; People v Coleman, 42 NY2d 500). Thus, in view of the fact that the People knew that the defendant had been represented by Mr. Lombardi in 1970 and 1971 in connection with possible criminal liability arising out of the death of Eileen Byrne, and that retainer had never been terminated to their knowledge — over and above which the interrogating officer’s review of defendant’s file on the morning of defendant’s admissions and confession had again revealed that he was represented by counsel — the conclusion that the defendant voluntarily waived his right to counsel cannot be sustained since the defendant’s attorney was not present at the time of the waiver. The defendant’s oral statements and written confession obtained on May 9, 1974, in the absence of counsel must be suppressed and, as a minimum, the defendant should be granted a new trial.
On the record now before us it is not clear whether the court should also have granted the motion to dismiss the indictment because of the delay in arresting and formally charging him with the Byrne homicide.
*252 Initially we note that the Supreme Court has drawn a distinction between delays occurring prior to arrest or formal accusation and those occurring afterward. Characterization of the delay as "preindictment” or "postindictment” is often determinative. Delay in bringing the defendant to trial after indictment or arrest is measured against the Sixth Amendment speedy trial requirement which takes into account a number of factors, including actual or potential prejudice to the defendant’s case through the loss of witnesses and the dulling of memory (Barker v Wingo, 407 US 514). Preindictment delay, on the other hand, is governed by the due process clause which generally requires a showing of actual prejudice before dismissal would be warranted (United States v Marion, 404 US 307; United States v Lovasco, 431 US 783).
The distinction is based essentially on the theory that the speedy trial guarantee was designed primarily "to prevent undue and oppressive incarceration prior to trial, [and] to minimize anxiety and concern accompanying public accusation” (United States v Marion, supra, p 320; see, also, United States v Lovasco, supra). The distinction assumes that these considerations do not become relevant until the defendant has been arrested or formally accused (United States v Marion, supra, pp 320-321). The Supreme Court has recognized, of course, that any delay in bringing the defendant to trial may impair his right to a fair trial, but it has assumed that the Statute of Limitations is the primary safeguard against potential prejudice when there has been a delay in arresting or formally charging the defendant (United States v Marion, supra, pp 321-323).
In the case now before us the nearly four-year delay in prosecution might technically be considered "preindictment” since the defendant was not arrested or formally charged with the Byrne homicide until May of 1974. However, more realistically, it could be said that he was actually — although not formally — accused of the homicide in October of 1970 when he was confronted by the police with the crime scene photographs of the dead girl; informed they "knew” that he did it, and went into a state of shock in response to the charge. Neither the police nor the prosecutor ever disclaimed or withdrew this statement and, in fact, the defendant’s arrest nearly four years later was based on what the police, and the defendant, knew in 1970. In addition throughout the period the defendant was incarcerated. Although he was serving a *253 sentence for another crime — the Patton homicide — the delay in charging him with the Byrne murder could have prolonged his incarceration, as a practical matter, by foreclosing the possibility of a concurrent sentence and by depriving him of any meaningful opportunity for rehabilitation for his activities in October, 1970 (Smith v Hooey, 393 US 374, 378-379). Finally it cannot be assumed that the Statute of Limitations will adequately protect the defendant against the potential prejudice inherent in any delay, since in this State there is no Statute of Limitations for murder or any class A felony (CPL 30.10, subd 2). In short it is arguable that in this case the delay, although technically preindictment, should not be assessed solely according to the limited due process standard established by the Supreme Court.[2]
In this State we have never drawn a fine distinction between due process and speedy trial standards. We have long held that "unreasonable delay in prosecuting a defendant constitutes a denial of due process of law” (People v Staley, 41 NY2d 789, 791; see, also, NY Const, art I, § 6). An untimely prosecution may be subject to dismissal even though, in the interim, the defendant was not formally accused, restrained or incarcerated for the offense (see, e.g., People v Winfrey, 20 NY2d 138; People v Wilson, 8 NY2d 391; People v Staley, supra). Thus the State due process requirement of a prompt prosecution is broader than the right to a speedy trial guaranteed by statute (see CPL 30.20; see, also, CPL 30.30) and the Sixth Amendment (see United States v Marion, 404 US 307, supra; Klopfer v North Carolina, 386 US 213). In some respects the State rule is less rigid in its application than the right to due process recognized under the Federal Constitution because, in a proper case, a lengthy and unjustifiable delay in commencing the prosecution may require dismissal even *254 though no actual prejudice to the defendant is shown (People v Staley, supra; People v Winfrey, supra).
The public also has a need for prompt prosecution of criminal offenders, for many reasons. For example, seeking or obtaining convictions long after the offense was committed disrupts the rehabilitation process (People v. Johnson, 38 NY2d 271, 276; People v Staley, supra) and penal sanctions lose much of their deterrent value when justice is delayed.
 Generally when there has been a protracted delay, certainly over a period of years, the burden is on the prosecution to establish good cause (People v Prosser, 309 NY 353; see, also, People v Winfrey, supra; People v Staley, supra). There is, of course, a need to investigate to discover the offender; to eliminate unfounded charges and to gather sufficient evidence to bring the case, or related cases, to court. Thus a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense (United States v Lovasco, supra). But if commencement of the action has been delayed for a lengthy period, without good cause, the defendant may be entitled to a dismissal although there may be no showing of special prejudice (People v Staley, supra; People v Winfrey, supra).
The defendant’s imprisonment for another crime cannot excuse the delay (People v Prosser, supra; People v Winfrey, supra; Smith v Hooey, 393 US 374, supra). There are procedures for insuring his return from other States and Federal penitentiaries (see, e.g., People v Winfrey, supra). Certainly his incarceration within the State offers no excuse for delaying the prosecution on new charges. Furthermore, waiting for a defendant to complete a current sentence may produce special hardships. His ability to prepare his case may be impaired because of his imprisonment. And, as noted, the delay may effectively extend the period of incarceration by foreclosing the possibility of a concurrent sentence. It may also interfere with his rehabilitation, particularly when he is already aware that he is suspected or "known” to have committed the other offense (Smith v Hooey, 393 US 374, 377-379, supra).
The fact that the investigation, however dormant, may remain open while the defendant is in prison should not alter the result. In a sense the investigation is always open for new *255 evidence until someone is charged with the offense, or the statutory period has run. The point is that the defendant’s incarceration is no excuse for putting off the prosecution, even though there is always the possibility that the delay may fortuitously yield additional evidence.
On the record now before us it is impossible to determine the cause of the delay. It appears that for over three years the police were simply waiting for the defendant to return from prison before they arrested him — perhaps in order to question him under more favorable conditions. However the officers who testified at the hearing stated that they had not made the decision to defer the prosecution and they did not know the reasoning behind it. It may be that those responsible — apparently members of the prosecutor’s staff and senior officers in the police department — had a legitimate reason for timing the prosecution as they did. Although the People have the burden of establishing good cause for the delay their failure to do so on this record should not be conclusive. In view of the fact that there was no hearing on the motion to dismiss and that the issue was not squarely presented at the suppression hearing which preceded the motion, the prosecutor should be afforded an opportunity to present additional evidence. Thus upon remand for a new trial, the order denying the motion to dismiss should be vacated, and the motion should be restored to pending status in order to afford the parties, particularly the prosecutor, an opportunity to produce additional proof.
Accordingly, the order of the Appellate Division should be reversed, the conviction vacated and the case remitted to the Supreme Court of Suffolk County, for further proceedings in accordance with this opinion.

. The trial court suppressed this statement on the ground that the "People have failed to establish that the defendant while confined in a mental hospital following an hysterical reaction, was capable of knowingly, intelligently and voluntarily making a statement.”

. It should be emphasized that we do not fully equate the accusation by the police with the formal commencement of criminal proceedings, nor do we consider it the controlling factor in this case, as is suggested by the dissent (see dissenting opinion p 257). We simply hold that in determining basic fairness to the defendant — which requires the State to minimize delay and, hence, anxiety attending a pending charge —we cannot always ignore the period preceding the formal filing of the accusatory instrument. A realistic appraisal must take this period into account when, as here, long before the defendant was formally charged the police informed him in no uncertain terms that they knew he committed the crime and that it was hanging over his head — as indeed it was. This, together with the other factors noted above, should make it clear that there is more at stake in this case than actual prejudice to the defendant’s ability to defend himself at trial (compare United States v Lovasco, supra; United States v Marion, supra).