THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
CHARLES LATIMORE *et al.*, Defendants-Appellees.

First District (5th Division)    No. 78-88

Opinion filed December 8, 1978.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

The State appeals the dismissal of an indictment charging defendants with deviate sexual assault and the issue presented is whether, under all the facts and circumstances, the five month interim between the occurrence and the indictment deprived them of due process.

It appears that at Cook County Jail, tier E-2, during the midnight shift on September 8, 1976, four inmates (later identified as Charles Latimore, David Rogers, William McGhee, and Jessie Reed)[1] escorted another inmate (Kenneth Skawinski) to an empty cell. Shortly thereafter, a jail guard returning from lunch break with his superior observed four men and then Skawinski leave the cell. The guard noticed that Skawinski had perspiration rolling down his forehead and appeared to be shaking, nervous, and in a state of shock. He questioned Skawinski, who first refused to tell what had happened; but, after being promised protection, said that four men had taken him from his cell at knifepoint and that two of them had had anal intercourse with him. He indicated that he could positively identify one of them by a tatoo on his chest.

Later, during the course of a five-day period, Charles Sanders, a jail

---

[1] Reed takes no part in this appeal. Although initially indicted along with defendants, he was subsequently adjudged unfit to stand trial.

investigator, took statements from defendants and Reed. Rogers stated that he and Latimore had anal intercourse with Skawinski; that McGhee and Reed were present; but that no force was used in achieving their purpose. Reed indicated that it was Latimore, McGhee, and Rogers who took Skawinski to the empty cell and then ran away when the guard approached. Latimore stated that he took no part in the incident but observed Rogers, Reed and McGhee escort Skawinski to the empty cell. He heard Skawinski being given the option of oral or anal intercourse and choosing the latter. McGhee stated that Latimore, Rogers and Reed asked him to join in an assault upon Skawinski, but he refused. He did, however, observe Rogers having intercourse with Skawinski.

On October 26, the jail closed its investigation and, on November 15, sent the accumulated data to the State's Attorney's office. Its file included among other things several declarative statements that Reed, Rogers, Latimore and McGhee had been positively identified as the assailants, but these statements did not reveal whether the identifications were based upon the observations of Skawinski or jail guards or upon the statements by which defendants implicated each other. In summation, the investigators reported that the absence of the guard on tier E-2 fostered the occurrence but that they were unable to determine whether Skawinski's participation was willing or the result of force.

As with a number of other prior complaints of deviate sexual assault forwarded by the jail's internal investigation unit, the State's Attorney's office began its own investigation to determine whether the alleged assailants should be prosecuted. It appears that several weeks were consumed in locating the jail investigator (Sanders) who was no longer employed at the jail, following which, in late December, the sitting grand jury requested that all matters other than pending investigations against jail officials not be presented. Thus, Sanders and Skawinski did not testify until the new grand jury was impanelled in January 1977. On January 25, a true bill was voted against defendants, and the indictment was returned on February 1.

Defendants were arraigned on February 10, at which time counsel was appointed, but Latimore changed attorneys on May 12. On June 9, each defendant filed a motion for pretrial discovery—none of which expressly or impliedly requested a list of prisoners housed on tier E-2 on the date of the occurrence. However, on August 25, 1977, Latimore filed a motion to dismiss the indictment based upon the following: (1) that the preindictment delay; *i.e.*, September 8, 1976, to February 1, 1977, was unreasonable and constituted a denial of due process; (2) that inmates of tier E-2, on the date of the alleged occurrence, whose testimony would exculpate him were released from custody, transferred to other correctional institutions, or otherwise unavailable; and (3) that his

inability to ascertain the identity of such witnesses has resulted in substantial prejudice.

On September 26, 1977, he filed a supplemental petition alleging that two persons known to him only as "Treaty" and "Guy Klan" were the individuals who assaulted Skawinski; that he last saw these men in Cook County Jail prior to his transfer from that institution in December 1976; that since returning to the jail upon being indicted in this cause, he has been unable to locate "Treaty" or "Guy Klan" within that institution; and that his "inability * * * to ascertain the identity of the aforementioned individuals has resulted in substantial prejudice to [his] right to a fair trial in violation of the 5th Amendment of the United States Constitution."

At the hearing on his petitions, Latimore agreed to stipulate to the State's Attorney's summation of the investigatory steps taken; *i.e.*, Sanders' initial investigation, transmission of his report to the State's Attorney's office, commencement of investigation by that office, search for Sanders, indictment by the January grand jury. However, he later objected to portions of the recitation on the ground that knowledge of a law enforcement agency is imputed to the prosecution and therefore the need for any investigation beyond that done by the jail investigatory staff was unnecessary and cannot be considered as being reasonable. The trial court granted Latimore's motion to dismiss the indictment on grounds that under the facts and circumstances preindictment delay "seriously hampered" and possibly destroyed the defense.

Within 30 days, the State filed a motion to vacate the dismissal, supported by two affidavits—one of Robert Glotz, an acting superintendent of the jail, which stated that a daily record called a tier sheet containing the names of all inmates confined on a given tier was kept in the ordinary course of business; that such sheets are kept for a period of six months and then destroyed; that the tier sheets compiled on September 8, 1976 (the date of the alleged occurrence here), would have been destroyed in the ordinary course of business on or about March 31, 1977; that no demand or request was made for the September 8, 1976, tier sheet compiled for tier E-2 until the State's *subpoena duces tecum* (on August 25, 1977) required its production—at which time the sheet had already been destroyed.

The second affidavit was that of the State's Attorney responsible for investigating the Skawinski complaint. It outlined the investigative steps taken and commented concerning similar complaints of deviate sexual assault forwarded by the jail's investigative staff which, after further investigation, were not prosecuted because of a lack of evidence. Attached as exhibits to this affidavit were the memorandum of the jail's

investigatory unit regarding the Skawinski complaint and a reconstruction of the destroyed tier sheet.

At the hearing on the motion to vacate, Eugene Kostelnak, an investigator for the State's Attorney's office, testified that he determined from entries in the tier book that 61 inmates were housed on tier E-2 on September 8, 1976; that from records indicating the dates on which inmates had visitors, received supplies, or were involved in incidents such as fights, he was able to reconstruct a list of 60 such inmates; and that, in addition to supplying the reconstructed tier sheet, those cards of the prisoners on the list which bore photographs were xeroxed. During cross-examination, he testified that only those inmates present for the midnight shift were included. The prosecutor then stipulated that the reconstruction of the list was not requested until after the date on which Latimore's indictment had been dismissed. Kostelnak, recalled for examination by the trial court, further testified that he knew for a fact that the 60 persons named on the reconstructed list were present on tier E-2 at the time in question but admitted that he personally did not make the entries in the records which he used to compile the list and that under the circumstances he could not testify to the accuracy of such entries. On this basis, the trial court denied the motion to vacate the dismissal of the indictment as to Latimore and then also dismissed the indictment as to Rogers and McGhee.

OPINION

The State contends that the trial court erred in dismissing the indictment. Its position is that the delay was necessary and reasonable; that defendants failed to demonstrate actual and substantial prejudice resulting from the delay; and, alternatively, that if there were any resulting prejudice, it was cured by the reconstruction of the tier sheet.

■■ ■ The rule to be applied where preindictment delay is claimed to constitute a denial of due process was recently enunciated in *People v. Lawson* (1977), 67 Ill. 2d 449, 459, 367 N.E.2d 1244, 1248, where it was said:

> "[T]he defendant must come forward with a clear showing of actual *and* substantial prejudice. Mere assertion of inability to recall is insufficient. If the accused satisfies the trial court that he or she has been substantially prejudiced by the delay, then the burden shifts to the State to show the reasonableness, if not the necessity, of the delay.
>
> If this two-step process ascertains both substantial prejudice and reasonableness of a delay, then the court must make a determination

based upon a balancing of the interests of the defendant and the public. Factors the court should consider, among others, are the length of the delay and the seriousness of the crime."

Guidance in determining whether delay is reasonable is furnished by the following observations of the United States Supreme Court:

"It requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself,' [Citation]. From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *Marion* [*United States v. Marion* (1971), 404 U.S. 307, 320, 30 L. Ed. 2d 468, 478, 92 S. Ct. 455, 463], a formal accusation may 'interfere with the defendant's liberty, * * * disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' [Citation.] From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *United States v. Lovasco* (1977), 431 U.S. 783, 790-92, 52 L. Ed. 2d 752, 759-60, 97 S. Ct. 2044, 2049-50.

Here, it is significant to note that the attack on Skawinski occurred in a place of confinement. Therefore, unlike a wrongfully accused defendant who merely observed a perpetrator commit a crime in an

unconfined area and then disappear without a clue, Latimore and McGhee knew that the persons they later claimed had been the offenders ("Treaty" and "Guy Klan") were accessible to jail officials. Inexplicably, they withheld such information and instead implicated each other and Reed. Although separated after the incident, Latimore once more was in Cook County Jail in December 1976, but even then made no attempt to notify officials of "Treaty" and "Guy Klan" or to otherwise make an effort to ascertain their names.

■■ Defendants were indicted on February 1, 1977, and counsel was appointed for them at that time, but again no request was made for a list of those confined in tier E-2 on the night of the occurrence. Due to the failure of the defense to request such a list and because of the fact that defendants, by implicating each other, obviated the use or the preservation of the list as an investigatory tool, it was destroyed in the ordinary course of business on or about March 31, 1978. Even at that time, the defense was not yet thwarted, because the tier sheets compiled during defendant's incarceration in December 1976, which also could have led to the identification of "Treaty" and "Guy Klan," were not destroyed until June 30, 1978. As clues leading to the identification of these men were available to the defense upon demand both before and after their indictment, we see no merit in defendants' contention that they were substantially prejudiced by the preindictment delay.

■■ Furthermore, even assuming there was a showing of actual and substantial prejudice, under *Lawson* the burden then would shift to the State to show reasonableness of the delay, which we believe was shown here. In November 1976, the State's Attorney's office was presented with the investigatory file asserting that defendants had been identified as the perpetrators, but which did not reveal the basis for such an assertion. In addition, the jail investigators indicated that they were unable to conclude whether or not sexual activity was engaged in willingly or was the result of force. This information appears to have been insufficient to require the prosecutor to have immediately sought an indictment. In fact, to have done so might well have been premature under the reasoning of *Lovasco*.

In their brief, defendants argue that the statements by which each of them sought to exculpate himself and inculpate the others, when considered in conjunction with their identification, presented such a strong case that indictments should have been immediately sought. We reject this argument. A proper prosecutorial preindictment consideration is whether enough evidence has been gathered so that guilt might be established beyond a reasonable doubt. Here, the State was confronted with the fact that the admissibility of such statements was questionable on two grounds: (1) they were hearsay, emanating from declarants who

might not testify at trial (see *California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930; *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620); and (2) to the extent that they might be viewed as admissions against the declarants, the question of the necessity of giving *Miranda* warnings was raised (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602). Under the circumstances, we think that the State's decision to locate Sanders to clarify and amplify the jail's investigative report and to initiate its own investigation was reasonable and necessary.

Moreover, had defendants demonstrated actual and substantial prejudice resulting from the delay and had the State failed to show the reasonableness of the delay, we are further of the belief that the reconstruction of the tier sheet cured any such prejudice. Kostelnak testified that through the use of records which indicated the dates on which supplies were issued to or visitors spent time with the inmates of tier E-2, he had identified 60 of the 61 inmates in question. Defendants argue that this reconstruction was incomplete, because the inmate history cards, as opposed to the records used by Kostelnak, indicate that four such inmates were not housed on E-2 that night and another 12 may or may not have been so confined. Therefore, it is their position that "Treaty" and "Guy Klan" *may* not be included in the list. Even assuming this to be the case, the document has not lost its value as an investigative tool, for the memories of the men listed could be employed in ascertaining the identities of "Treaty" and "Guy Klan." Furthermore, it was the acts and omissions of defendants which shielded the relevancy of the original tier sheets to the investigation, and the documents themselves have no relevance to the guilt or innocence of defendants but merely provided clues to the identities of "Treaty" and "Guy Klan."

Lastly, Latimore asserts that we should not consider the jail investigatory file and the reconstructed tier sheet, because he contends that they were improperly received into evidence at the hearing on the State's motion to vacate.

Unlike an appellant, for whom the scope of review is limited by his assignment of errors, an appellee may sustain the finding of the trial court by any argument based upon issues appearing in the trial record. *Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365.

The trial court may entertain a timely filed motion for reconsideration of a final appealable judgment in a criminal or civil matter. (*People v. Heil* (1978), 71 Ill. 2d 458, 376 N.E.2d 1002.) However, because *Heil* is silent regarding the applicable criteria to be imposed upon the admissibility of evidence in a hearing upon such a motion, he posits that the criteria governing a motion for new trial should control. He contends that *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288,

requires a showing that such evidence was unavailable during trial despite due diligence. He argues that the State failed to demonstrate that the records of the jail investigation and the reconstructed tier sheet were unavailable during the initial dismissal hearing and, as a result, that evidence failed to meet the requisite criteria of *Reese* and should not have been admitted. We disagree.

In *Heil*, although present at the original hearing wherein defendant was discharged (based upon a violation of his right to a speedy trial), the State did not at that time introduce evidence tending to show that the delay was chargeable to the defense. Instead, such evidence was first introduced at the hearing on its motion to vacate the order of discharge. This court reversed defendant's conviction, stating:

> "We * * * hold that the trial court committed reversible error by retrying the issue previously adjudicated. To so hold in a case such as this shields an accused from harassment and * * * prevents the State from circumventing the prohibition against a reindictment of an accused who has been discharged, which the State may otherwise be able to do by simply obtaining a readjudication of the matter. Lastly, it prevents the possibility of inconsistent judicial determinations of fact while concomitantly it puts the parties to the task of presenting all the relevant facts and arguments in a single proceeding." (*People v. Heil* (1977), 49 Ill. App. 3d 55, 61-62, 364 N.E.2d 966, 970.)

In his dissent, Mr. Justice Jones noted:

> "As the majority states in this case, there was a readjudication of the order of discharge by the trial court and both questions of law and of fact were involved. That 'readjudication' consisted of considering further evidence regarding which of the parties, the State or the defendant, had been responsible for delay of the trial beyond 120 days. However, such reconsideration by the court is well within the court's powers. It may set aside its orders or judgments within the 30 days and upon such being done it is the same as though those orders or judgments were never entered in the first instance—they simply become a nullity. *People v. Gulley* [(1952), 411 Ill. 228, 103 N.E.2d 650.]" 49 Ill. App. 3d 55, 63, 364 N.E.2d 970, 972 (dissent).

In support of the determination of the majority in *Heil*, defendant contended before the supreme court "that the People 'either declined or neglected to present all its evidence and case law' at the time of the original hearing and that the piecemeal approach followed here 'is both repugnant to the efficient administration of justice and fundamentally unfair to the defendant.' " (71 Ill. 2d 458, 461, 376 N.E.2d 1002, 1003.) As the appellate opinion dealt extensively with the fairness of allowing the State to introduce further evidence without explanation of the earlier

omission and as this question was raised before the supreme court, we are of the opinion that by its reversal the supreme court implicitly upheld the lower court's procedure whereby evidence not presented in the original hearing was admitted in the hearing on the motion to reconsider.

■■ In view thereof, we do not believe that the admission of evidence in a hearing on a motion to reconsider or vacate is governed by the rules dictating the character and quantum of proof necessary to prevail on a motion for a new trial based on newly discovered evidence. This is particularly true in a case such as the one at bar, where Latimore in the original proceeding agreed to stipulate to the prosecutor's rendition of the events which transpired during the investigatory interval prior to indictment and then, as the hearing was drawing to a close, attempted to revoke his stipulation. Since the record reveals that the agreement to stipulate predated that hearing, there is little wonder why the State was not prepared to present evidence at that time. Under the circumstances, we do not believe that the trial court erred in admitting the jail's investigatory report and the reconstructed tier sheet.

For the reasons stated, the judgment appealed from is reversed and the cause remanded for further proceedings not inconsistent with the views expressed in this opinion.

Reversed and remanded.

LORENZ and WILSON, JJ., concur.

