People v Atkinson (2024 NY Slip Op 24262)

[*1]

People v Atkinson

2024 NY Slip Op 24262

Decided on October 15, 2024

Supreme Court, New York County

Drysdale, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on October 15, 2024
Supreme Court, New York County

The People of the State of New York,

against
Larry Atkinson, Defendant.

IND-70453-23

For the People: Assistant District Attorney Megan Joy, Of Counsel
Assistant District Attorney Katelyn Damanis, Of Counsel
New York County District Attorney's Office
For the Defendant: Liam Malanaphy, Esq.
LRM Law Firm
Michael Mandel, Esq.
The Law Offices of Michael Mandel

Althea E.M. Drysdale, J.

The indictment charges the defendant with two counts of Murder in the First Degree pursuant to Penal Law § 125.25(1) in relation to a cold case investigation into the double homicide of a mother and her special needs daughter in the winter of 1994. Through this motion, the defendant moves to dismiss the indictment pursuant to Criminal Procedure Law ("CPL") 210.40 and People v. Singer, 44 NY2d 241 (1978) arguing that the prosecution's delay in prosecuting the instant case is unreasonable and thus violates the defendant's right to due process. Additionally, and in the alternative, the defendant moves for an evidentiary hearing to determine whether the delay in prosecution was unreasonable. The People oppose, arguing that the delay in prosecution was reasonable under the circumstances and that the case should proceed to trial. For the reasons stated herein, the defendant's motion to dismiss is denied in its entirety.
Summary of Facts
On the night of February 20, 1994, Celeste "Cookie" Cornelius, reported for her job as a home health aide to Sarah Roberts and her disabled adult daughter Sharon Roberts to find both women strangled to death on the floor of their shared apartment.
Responding officers found no signs of forced entry. Photographs from the crime scene depicted Sarah laying face-down on a bed with obvious ligature devices around her throat. Sharon was found on the floor of a bedroom with two ligature devices tightly wound around her neck. According to autopsy reports completed by the medical examiner's office, the cause of death for both women was listed as homicide by strangulation. Autopsy examinations revealed that they were strangled by objects tightly wound around their necks, and the medical examiner noted several injuries consistent with strangulation such as visible marks on their necks, facial abrasions, contusions, lacerations to their face, muscle damage, as well as fractures to their hyoid and larynx.
Law enforcement officials immediately initiated an investigation into the murders by interviewing witnesses, reviewing video surveillance footage, and submitting evidence from the scene for testing. Among those interviewed were this defendant, Larry Atkinson, who was dating the Roberts' home health aide, Cookie, and had been to the apartment on a prior occasion to address a maintenance issue. Samples taken from the crime scene and submitted to the OCME for analysis identified Sharon and Sarah Roberts' blood throughout the apartment but, due to the lack of technology and testing available in 1994, did not identify blood or DNA of a possible perpetrator. Sometime after 1996, the case was closed due to a lack of probable cause to arrest a suspect.
The investigation was again reopened eight years later in 2004, at which point detectives from the NYPD's Cold Case Unit resubmitted evidence for testing by the OCME. Additional PCR DNA testing revealed that Sharon Roberts could have been the source of blood found on the bathroom floor and toilet, and that Sarah Roberts was excluded as a possible contributor. Blood samples from the kitchen trash revealed an insufficient amount of DNA for testing. Detectives from the Cold Case Unit had requested "epithelial testing" for the tubing and leggings used as ligature devices, and OCME noted that the items were unsuitable for testing for non-victim DNA. At this point in time, additional investigation and testing failed to give rise to a suspect or probable cause for an arrest, and the case was again closed.
In February of 2022, Detective Ryan Glas, newly assigned to the NYPD Cold Case Squad, decided to reopen this case while reviewing a book containing unsolved murders in New York City. One month later, Detective Glas conferred with the OCME, who in turn informed Det. Glas that some of the items recovered from the scene were suitable to reanalysis and testing using more modern methodologies and equipment. At that point, Det. Glas conferred with the Manhattan District Attorney's Office Cold Case Unit, who agreed to reopen the case and approve forensic testing of fingernail scrapings from Sarah Roberts, fingernail scrapings from Sharon Roberts, and dried secretions recovered from the body of Sarah Roberts.
On August 15, 2022, the OCME issued a report indicating that a male DNA profile was generated from the dried secretion swab taken from Sharon Roberts' hand. A mixture of DNA was further recovered from Sarah Robert's left fingernail indicating that Sarah comprised 45.33% of the mixture and Male Donor A comprised the remaining 54.67% of the mixture. A DNA profile could not be determined from the mixture, but the results were deemed suitable for comparison. Male Donor A was compared to the dried secretion from Sharon Roberts' hand and the two were deemed to be a match. The Male Donor A profile was then uploaded to CODIS for comparison to known DNA samples.
Ten days later, on August 25, 2022, CODIS informed OCME of a match between Male Donor A and the known DNA profile of the defendant. Upon being informed of the match, Det. Glas began to conduct a thorough investigation into the defendant by surveilling him on several occasions, checking his incarceration record to confirm that he was not incarcerated on the date of the homicides, and reviewing body-worn camera of the defendant from prior interactions with law enforcement officials.
The defendant was then arrested and charged with the instant offense on January 23, 2023. When this case was presented to the Grand Jury, a criminalist from the OCME testified that the [*2]technology used to develop the Male Donor A sample in 2022 did not exist when testing was initially conducted in 1994 and 2004.
Conclusions of Law
An "unreasonable delay in prosecuting a defendant constitutes a denial of due process of law." People v. Singer, 44 NY2d 241, 253 (NY Ct. App. 1978) quoting People v Staley, 41 NY2d 789, 791 (NY Ct. App. 1977) and NY Const, art I, §6. "An untimely prosecution may be subject to dismissal even though, in the interim, the defendant was not formally accused, restrained or incarcerated for the offense," without a showing of prejudice by the defendant. Id. When there is a protracted delay in the prosecution of a case, the burden rests with the People to establish good cause for the delay. Id. "A determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense." Id. at 254, citing United States v. Lovasco, 431 U.S. 783 (1977). "There is, of course, a need to investigate to discover the offender; to eliminate unfounded charges and to gather sufficient evidence to bring the case, or related cases, to court. Thus a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense." Singer at 254.
As a threshold matter, there is no statute of limitations for the charge of Murder in the Second Degree in New York State. PL § 125.25. In determining whether a delay in prosecution requires dismissal, Courts must weigh the five factors laid out by the Court of Appeals in People v. Taranovich, 37 NY2d 442, 445 (NY Ct. App. 1975), which examine (1) the extent of the delay, (2) the reason for the delay, (3) the nature of the underlying charge, (4) whether or not there has been an extended period of pretrial incarceration, and (5) whether or not there is any indication that the defense has been impaired by reason of the delay. Of course, this examination must be viewed in light of Singer's caveat that the defense need not show prejudice in order for a motion for dismissal to be granted. The Court will therefore examine each of these factors in turn:
I. Extent of the Delay
The homicides of Sarah and Sharon Roberts occurred in February 1994. The defendant was arrested and charged in relation to these crimes in January 2023, 29 years after the crime occurred. Both sides correctly concede that 29 years constitutes a substantial delay in prosecution. However, Courts have declined to set forth a per se length of delay that requires the dismissal of charges, (Taranovich, 37 NY2d at 445), instead opting for an individualized review of the factors present in each specific case to determine whether the length of the delay is warranted. Courts have further upheld the prosecution of cases with a similarly lengthy period of delay.[FN1]

II. Reason for the Delay
Based upon a review of the evidence submitted to this Court as well as the motion papers submitted by both parties, the 29-year delay in prosecution is clearly not due to the prosecution's dilatory tactics in investigating and prosecuting this crime, but instead a lack of available evidence at the time the crime was committed to establish probable cause for an arrest, as well as the lack of modern-day technology that eventually led to the identification of the defendant's DNA profile on evidence recovered from the victims' bodies. The People have therefore met their burden of establishing a reasonable explanation for the delay in prosecution. See, e.g., People v. Jolivert, 223 AD3d 572, 574 (App. Div. 1st Dept. 2024) ("The 22-year delay in the prosecution of this case was not due to bad faith, but the result of the lack of technology required to conduct the necessary DNA analysis at the time of the 1993 murder.") Despite the defendant's argument to the contrary, the People and the NYPD were not required to relentlessly (and needlessly) conduct forensic testing on cold case evidence without a reasonable expectation of obtaining new information:
Defendant's contention that the New York City Police Department (NYPD) should not be excused for their failure to request DNA testing on the fingernail clippings prior to 2015 is without merit. To be sure, in the serenity of chambers, it would be easy to play Monday morning quarterback and conclude that the NYPD should have acted sooner and submitted the clippings to OCME earlier. However, to reach this conclusion would be to ignore the history of the development of DNA testing, and would also fail to give due deference to the NYPD in prioritizing their resources between new and old cases. Notably, in 1989-1990, when the instant investigation was still active, OCME was not yet accredited to perform forensic DNA testing. Indeed, OCME first began what is now perceived as rudimentary DNA testing in 1996, and even then there was no database into which DNA profiles generated from case evidence could be uploaded and DNA profiles from convicted felons could be stored. [...] Under these circumstances, if the court were to find fault in the NYPD for not requesting DNA testing on the clippings prior to 2015, in effect, [*3]it would be imposing upon the NYPD an unrealistic requirement to keep investigations open indefinitely.
People v. Parrilla, 56 Misc 3d 766, 768—69 (NY Sup. Ct., Bronx Cty., 2017) (Barrett, J.)
For these reasons, the People have established a satisfactory explanation for the lengthy delay of the prosecution of this case.
III. Nature of the Underlying Charges
The underlying charges in this case consist of two counts of Murder in the Second Degree pursuant to PL § 125.25 relating to the deaths of Sarah and Sharon Roberts. At the time of their murders, both women were particularly vulnerable: Sarah Roberts was physically disabled, reliant on an oxygen tank, and required the assistance of a home health aide, while Sharon Roberts was developmentally disabled and also relied on the assistance of a home health aide. Both women were strangled to death, with noticeable ligature marks and damages to the hard and soft tissue surrounding the ligature devices. Both sides correctly concede that the nature of the underlying charges in this case are extremely serious.
IV. Length of Defendant's Pre-Trial Incarceration
The defendant argues that he has been incarcerated for a significant period of time in relation to these charges. The defendant was arrested on January 23, 2023 and has remained incarcerated since that time, for a total of twenty months. If convicted for the murders of Sharon and Sarah Roberts, as a predicate felon, the defendant faces a lengthy prison sentence that, due to the defendant's age and medical concerns, would likely equate to a life sentence. 
The defendant argues that a multitude of medical ailments further complicate his pretrial incarceration, making his continued incarceration before trial "uniquely injurious" and far more burdensome than similarly-situated defendants and inhibiting his ability to fully engage with his attorneys and prepare his defense.
In recognition of Mr. Atkinson's medical ailments, it should be noted that, prior to each and every Court appearance, this Court has afforded the defendant an opportunity to meet and confer with his attorneys on a separate floor in an empty courtroom designated for defendant-attorney conferences, as well as in a private area of the Courtroom before the case has been called onto the record. This Court will continue to provide the defendant with these opportunities to confer with counsel throughout the trial, as well as provide Mr. Atkinson with as many breaks throughout the trial as necessary in order to ensure that he is comfortable and that his medical needs are tended to throughout the prosecution of this case. This Court will also note that the proceedings have been scheduled as expeditiously as possible in recognition of the defendant's health issues, and delays have only been permitted to accommodate required changes in counsel for both the People and the Defense.
Viewing Mr. Atkinson's medical ailments and pretrial incarceration alongside the totality of the circumstances surrounding this case, Mr. Atkinson's medical ailments, though serious, do not outweigh the seriousness of the offenses charged and do not warrant dismissal of this case.
V. Whether the Defendant has Been Impaired by the Delay
Finally, the defendant argues that he has been severely impaired by the delay in prosecution. It should be reiterated that, although the Court may consider the impairment caused to the defendant by the delay in prosecution, the defendant is not required to show prejudice in order for dismissal to be granted. Singer, supra at 253-54.
Specifically, the defendant asserts that the People can offer no satisfactory explanation for the fourteen-year gap between 2008, when the OCME started routinely testing fingernail scrapings and associated debris, and the defendant's arrest in January of 2023. As explained supra, law enforcement officials cannot be expected to reopen each and every cold case investigation simultaneously as soon as a new methodology for evidence gathering or mechanism for testing is invented or accredited. To do so would oversimplify law enforcement's allocution of limited resources to investigate hundreds of cold cases and hold them to a standard that is, quite simply, impossible to achieve under the circumstances.
The defendant relies heavily the Court's decision in People v. Grant, 82 Misc 3d 991 (Kings Co. Sup. Ct., 2024), wherein the Court dismissed the prosecution of a 1992 homicide based on law enforcement's failure to test trace amounts of semen recovered from the decedent's mouth until 2018, 16 years after the homicide had occurred. However, seeing as though this decision was issued by a Court of concurrent jurisdiction, this Court is not bound by the decision and declines to adopt the Grant findings to the instant matter.
Conclusion
For the reasons stated herein, the defendant's motion to dismiss the indictment due to an unreasonable delay in prosecution resulting in a violation of the defendant's right to Due Process is denied. The defendant's request for an evidentiary hearing is similarly denied, as the defendant has failed to raise any substantive issues that would require an evidentiary hearing.
This constitutes the Decision and Order of the Court. 
Dated: October 15, 2024
New York, New York
Hon. Althea E.M. Drysdale, A.J.S.C.

Footnotes

Footnote 1: See, e.g., People v. Charr, 77 AD3d 1285 (App. Div. 4th Dept. 2010) (Upholding a 33-year delay in prosecution of a homicide where there was insufficient evidence to prosecute the case at an earlier date); People v. Mattison, 162 AD3d 905, 906 (App. Div. 2nd Dept. 2018) ("[A] significant amount of the delay was due to a lack of evidence identifying a viable suspect. After the defendant's fingerprints were matched to the fingerprints recovered from the three boxes in the decedent's bedroom, further investigation was conducted. The People had a good-faith basis to wait until they had sufficient evidence to arrest the defendant."); People v. Innab, 182 AD3d 142 (App. Div. 2nd Dept. 2020) ("Although the 28-year preindictment delay in defendant's prosecution for murder was undoubtedly extraordinary, the People met their burden of demonstrating good cause for the delay in deferring commencement of the prosecution until after they were able to match the defendant's DNA profile with the one found on some of the blood-stained items recovered from the crime scene. [...] Here, while DNA testing of the crime scene evidence could have been performed years earlier, there was nothing to suggest that such tests would have yielded any meaningful information, as the defendant's own DNA profile was not available to investigators for comparative purposes until defendant pleaded guilty to an unrelated felony charge more than 20 years after the murder, and was required to submit a DNA sample for the [CODIS]."); People v. Wald, 215 AD3d 497, 497—98 (App. Div. 1st Dept. 2023), lv den. 41 NY3d 1005 (2024) ("Although the 21-year delay was significant, it was not due to bad faith or to gain a tactical advantage. Instead, it was the result of the prosecutor's efforts to acquire additional evidence to prove defendant's guilt beyond a reasonable doubt. The investigative delays were satisfactorily explained and were permissible exercises of prosecutorial discretion."); People v. Tsang, 284 AD2d 218 (App. Div. 1st Dept. 2001) (Upholding prosecution 20 years after crime due to inability to locate defendant.); People v. Vernace, 96 NY2d 886, 888 (NY Ct. App. 2001) (Upholding 17-year delay in double homicide prosecution due to issues with eyewitnesses who were unwilling to testify against defendants due to their ties to organized crime and the gruesome nature of the offense.).