STATE of North Dakota, Plaintiff
and Appellee,

v.

Dan Joe DENNY, Defendant
and Appellant.

Crim. No. 963.

Supreme Court of North Dakota.

May 10, 1984.

Kent A. Reierson, State's Atty., Williston, for plaintiff and appellee.

Anseth & Zander, Williston, for defendant and appellant; argued by Janet Holter Zander, Williston.

SAND, Justice.

Dan Joe Denny, defendant, was found guilty by a jury of having delivered a controlled substance in violation of North Dakota Century Code §§ 19–03.1–23(1)(b) and

19–03.1–05(4)(*o* ). The judge sentenced him to five years in the State Penitentiary. A criminal judgment was entered accordingly, from which the defendant appealed.

On 3 January 1983 Detective Kemmet introduced Special Agent Wiley to a confidential informant who told Wiley that the defendant Denny had marijuana for sale at his residence in the Red Barn Trailer Court in Williams County, North Dakota. A surveillance unit, consisting of Agent Oser, Detectives Kemmet, Wentz, Quickstad and Sanders, was formed, who were able to listen to the conversation between Wiley and the defendant by means of a listening device and transmitting unit that Wiley had on his person for his protection. At the Red Barn Trailer Court the confidential informant advised Wiley that the cost per ounce was $65.00. They then drove to Denny's trailer home. The confidential informant entered the trailer and in a short time came out with the defendant. The confidential informant handed the marijuana to Agent Wiley and introduced "Dan" to Wiley and stood by Wiley's car. Wiley then began negotiating on the price of the marijuana, for which Denny wanted $70. Wiley paid Denny the $70, after which the defendant said that Wiley could stop back for further deals with him (Denny). After the delivery was completed, Wiley looked at a police photograph to assure himself that the individual with whom he was dealing was Dan Denny. (A file, including pictures of persons investigated, was being maintained.)

On 22 August 1983 Dan Joe Denny was arrested for the offense of dealing in a controlled substance.

The defendant contended (1) his right to due process was violated by a prejudicial delay in not commencing prosecution until nearly nine months after the alleged occurrence; and by the court's failure to suppress in-court identification testimony which was tainted by an impermissibly suggestive identification procedure of having displayed a single police photo of the defendant to the witness before trial; and (2) his right to a fair trial was violated by the court's refusal to require the State to disclose and identify the confidential informant where the defendant claimed that the agent's in-court identification was mistaken.

■ The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 12 of the North Dakota Constitution.[1] That right, however, does not attach until a defendant "in some way becomes an 'accused'." *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468, 474 (1971). Specifically, "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge" that activates the speedy trial provision of the Sixth Amendment. *Id.* at 320. 92 S.Ct. at 463, 30 L.Ed.2d at 479.

■ The *Marion* court noted that possible prejudice is inherent in any delay. Possible prejudice, however, is not itself sufficient to establish a due process claim. Relevant statutes of limitations guard against possible, as distinguished from actual, prejudice. *Marion, supra*, 404 U.S. at 322, 92 S.Ct. at 464, 30 L.Ed.2d at 479. Case law suggests that the amount of pre-accusation delay does not establish prejudice per se. *See id.*

■ Actual prejudice may "[make] a due process claim concrete and ripe for adjudication," but that does not "[make] the claim automatically valid." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752, 759 (1977). Thus, proof of prejudice is generally a necessary but not sufficient element of a due

---

**1.** The defendant also relied upon Rule 48(b), NDRCrimP, which provides that a court may dismiss an indictment, information, or complaint for unnecessary delay. Rule 48(b), however, "does not apply to delays which take place between the commission of an offense and the initiation of the proceeding." Rule 48(b), NDRCrimP, Explanatory Note. *See also United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478 (1971) (Federal Rule 48(b) limited to post-arrest situations).

process claim. *Id.* at 790, 97 S.Ct. at 2048, 52 L.Ed.2d at 759. A due process inquiry considers "the reasons for the delay as well as the prejudice to the accused." *Id.*

In the present case the delay between the commission of the offense and Denny's arrest was about eight months. Under *Marion,* Denny became an accused when he was arrested on 22 August 1983. Further, the time factor did not exceed the applicable statute of limitations. Denny was convicted of a class B felony. North Dakota Century Code § 29–04–02 provides that:

"An information for any felony other than murder must be filed, or an indictment must be found, within three years after its commission...."

In *Marion* the Court noted the role of statutes of limitation, saying:

"There is ... no need to press the Sixth Amendment into service to guard against the mere possibility that pre-accusation delays will prejudice the defense in a criminal case *since statutes of limitation already perform that function.*" [Emphasis added.] *Marion, supra,* 404 U.S. at 323, 92 S.Ct. at 465, 30 L.Ed.2d at 480.

The *Marion* Court further noted, however, "that the statute of limitations does not fully define [a defendant's] right with respect to the events occurring prior to indictment." *Id.* at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 480. Due process will not condone an intentional pre-indictment delay for the purpose of obtaining an advantage over the accused if the delay will cause prejudice to defendant's right to a fair trial. *Id.*

In the present case, as in *Lovasco,* the State claimed that the delay was caused by the need to continue an investigation in the hope that other persons would be arrested. During the period between Denny's involvement and his arrest, undercover agents from the drug enforcement unit, the Williston police department, and the Williams County sheriff's office, were conducting what the State termed an "undercover sting operation." The investigation reportedly involved controlled substances and sto-

len goods. The State argued that had Denny been arrested sooner the undercover agent's usefulness would have been destroyed.

As the court noted in *Lovasco,* investigative delay is unlike delay by the State solely to gain tactical advantage over the accused because investigative delay "is not so one-sided." 431 U.S. at 795, 97 S.Ct. at 2051, 52 L.Ed.2d at 762. The court explained:

"Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed.' [Citations omitted.] This the Due Process Clause does not require .... to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 795–96, 97 S.Ct. at 2051–52, 52 L.Ed.2d at 762–63.

Even the legitimate reason of continuing investigation may be "stretched to the breaking point." *United States v. Jackson,* 504 F.2d 337, 340 (8 Cir.1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975). The record, however, supports the State's contention that the continuing investigation was legitimate. Special Agent Wiley testified that thirty-eight more people were arrested. Furthermore, we are cognizant of the important role that informants and undercover agents play in the apprehension of persons involved in illegal drug transactions. Under the circumstances, we cannot conclude that the investigation was "stretched to a breaking point."

Finally, we are not convinced that the defendant suffered any actual prejudice constituting a due process violation. Denny asserted that, because of the delay, he had no way of knowing where he was or

who he was with on 3 January 1983. Denny himself, however, testified that he suffered from occasional blackouts caused by excessive drinking. The record further reflects that Denny recalled where he lived, who he was living with, and where he was working on 3 January. Further, the trial judge, in addition to granting several of Denny's discovery motions, granted his motion for preservation of an alibi defense pending an opportunity for him to fully investigate the facts.

■ Based upon the foregoing analysis, we conclude that the trial court did not err in denying Denny's motion for dismissal based upon pre-accusational delay.

Denny's second contention was that the trial court erred in denying his motion to compel disclosure of the identity of the confidential informant.

■ The State may generally refuse to disclose the identity of a person who has furnished information relating to a possible violation of the law. Rule 509, NDREv; *see also* NDCC § 31–01–06(4) (public officer cannot be examined as to communications made to him in official confidence when public interests would suffer by disclosure). The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. *State v. Mertens*, 268 N.W.2d 446, 451 (N.D.1978); *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639, 644 (1957); *see generally* Annot., 76 A.L.R.2d 262.

■ Rule 509, however, provides a means for disclosure of the identity of an informer if it appears that an informer may be able to "give testimony relevant to any issue in a criminal case." A determination of whether or not disclosure is justified requires a balancing of the interests of the public and the defendant. *Mertens, supra*, 268 N.W.2d at 451; *Roviaro, supra*, 353 U.S. at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646. A court must consider the totality of the particular circumstances of each case, particularly the crime charged, the probable defenses, the possible significance of the informant's testimony, and other relevant factors. *Ibid.* The question is one of fundamental fairness. *Roviaro, supra*, 353 U.S. at 60, 77 S.Ct. at 628, 1 L.Ed.2d at 645.

The defendant relied heavily upon *Roviaro* in which the Court reversed a lower court decision denying the defendant's motion to compel disclosure of an informant in a case involving a narcotics transaction. The defendant was a passenger in the car driven by the informant. A police officer had concealed himself in the trunk of this car. The officer was carrying a device to open the trunk lid from the inside. Later, when the car stopped, the defendant got out of the car and walked to a nearby tree to pick up the narcotics. The officer overheard this conversation. The Court held that the nondisclosure was particularly unfair because the only person, other than the defendant himself, who could controvert the officer's version of the conversation was the informant. The Court stated that it was "a case where the government's informer was the sole participant, other than the accused, in the transaction charged." 353 U.S. at 64, 77 S.Ct. at 630, 1 L.Ed.2d at 647.

The present case can be distinguished from *Roviaro* because officer Wiley's testimony can be substantiated. In addition to his own account of the transaction, Wiley testified that he was equipped with a transmitting device that enabled other officers to hear the conversation. Officers Kemmet and Quickstad testified that they were equipped with receivers and were able to hear the entire conversation between all of the parties. Further, officer Wentz testified that, although he arrived late, he heard about one-half of the conversation.

■ Although the informant was at the scene and exited the trailer carrying the narcotics,[2] he was not as involved as the

---

**2.** We are compelled to observe that it is an injudicious practice for an informant to carry and deliver controlled substances to a putative

defendant. However, under the circumstances of the present case, we believe that sufficient

informant in *Roviaro* was. In *Roviaro* the defendant dealt only with the informant. In the present case the individual who purchased the drugs from Denny was officer Wiley, not the informant. Mere presence of the informer when the controlled substance is sold to a police officer is not sufficient to overcome the privilege of nondisclosure. *Lewandowski v. State,* 374 N.E.2d 566, 569–70 (Ind.App.1978). The officer who purchased the controlled substance and the three officers who heard the conversation between Wiley and Denny all testified at trial and were subject to cross-examination by defendant's counsel. Denny did not present any evidence that would have cast doubt upon the credibility of their testimony.

Denny, at the hearing on his motion seeking disclosure of the informant, alleged that he had "reason to believe" the case was one of mistaken identity. However, Denny presented no grounds that the trial court could have considered in weighing the probability of his claim. A mere allegation or suspicion that a particular defense may be applicable is not enough. The defendant must establish some degree of probability before the trial court will be required to weigh the relevant factors in a decision to require disclosure of an informant's identity. See *Mertens, supra,* 268 N.W.2d at 453. The State has the privilege of withholding the identity of an informer and thus the burden is upon the defendant seeking disclosure to demonstrate an exception to the privilege that the informer remain anonymous. *Lewandowski, supra,* at 568; *McCants v. State,* 363 So.2d 362, 364 (Fla.App.1978).

We conclude that the trial court did not err in refusing to require the State to disclose the identity of the informer.

Denny's final contention was that he was denied due process of law under the fourteenth amendment because officer Wiley's in-court identification was tainted by an earlier suggestive display of Denny's photograph. Wiley testified that on the eve-

ning of the transaction he talked with officer Kemmet and that Kemmet showed him a single photograph contained in the police department's file on Denny. Wiley stated that the photograph was of the same individual with whom he had dealt that evening. Wiley later made an in-court identification of Denny.

The general rule regarding the use of single photographs for identification of suspects is that each case must be considered on its own facts. *State v. Azure,* 243 N.W.2d 363, 366 (N.D.1976). Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to create a very substantial likelihood of irreparable misidentification. *Ibid.* We have said that single photograph identifications should generally be avoided because they are unduly suggestive and ordinarily can be eliminated at slight inconvenience. *Id.* at 365. However, there may be circumstances where single photograph identification is necessary. *Id.* at 365–66.

The present case is factually dissimilar from most cases wherein a single photograph is shown to a victim of a crime and asked, "Is this the person?" In the instant case, the identification was made by a police officer to confirm that the person was who he said or held himself out to be and was in the presence of another officer shortly after the crime. The case is, therefore, more similar to *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

In *Manson* an undercover police officer named Glover and an informant purchased narcotics from the defendant at the defendant's apartment. Glover at the time did not know the identity of the seller. Minutes after the deal, Glover and the informant returned to police headquarters where Glover described the defendant to two other officers. Later one of the officers obtained a photograph of the defend-

additional evidence exists to support the conviction.

ant and left it at Glover's office. Glover, when alone, viewed the photograph for the first time when he returned to his office two days later. Glover identified the person shown as the one from whom he had purchased narcotics and he later made a positive in-court identification.

The court held that the relevant factors in evaluating the suggestive nature of photographic identifications in such cases are the opportunity of the witness to view the defendant at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the defendant, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Manson, supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Applying those factors, the court held that Glover's photographic identification was not impermissibly suggestive. *Id.* at 117, 97 S.Ct. at 2254, 53 L.Ed.2d at 155–56.

In the present case Wiley testified that he stood near Denny and talked with him for two or three minutes. Although it was fairly dark out, Wiley stated that they were standing near the front of the trailer within the illumination of a porch light. Wiley testified that "if [he] had to take any money out of [his] billfold, [he] could have counted the exact denomination without having to squint."

Like officer Glover in *Manson*, Wiley "was not a casual or passing observer, as is so often the case with eyewitness identification." Rather, Wiley was a "trained and experienced officer on duty" who "could be expected to pay scrupulous attention to detail" because "he knew that subsequently he would have to find and arrest his vendor." Further, "he knew that his claimed observations would be subject later to close scrutiny and examination at trial." *Manson, supra*, 432 U.S. at 115, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. Wiley testified that he had attended seven weeks of general investigative training in Bismarck and eight weeks of special investigative training in Georgia sponsored by the Drug Enforcement Administration. He stated that he spent much of that time learning identification techniques.

In the present case there is no issue regarding the accuracy of the description of the defendant. The informer told Wiley before they arrived at the scene that the trailer house was Dan Denny's and that the individual he would deal with would be Denny. In *Manson*, the officer did not know the identity of the seller until he viewed the seller's photograph two days after the crime. Thus, although Wiley was not alone when he viewed the photograph, he did not experience the pressure that may have been present in establishing Denny's name for the first time.

Wiley was highly certain that he had correctly identified Denny. In response to a question whether or not he had any doubt that the photograph he saw was of the same individual with whom he had dealt, Wiley stated "No, there [wasn't]."

In *Manson* the time between the crime and the photographic identification was two days which, significantly, the court noted was not "the passage of weeks or months." 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155. In the present case, Wiley viewed Denny's photograph the same evening as the crime.

Considering all of the circumstances, we conclude that there was no substantial likelihood of irreparable misidentification.

The judgment of conviction is affirmed.

ERICKSTAD, C.J., and GIERKE, PEDERSON and VANDE WALLE, JJ., concur.