# UNITED STATES *v.* LOVASCO

No. 75–1844.   Argued March 21–22, 1977—Decided June 9, 1977

*John P. Rupp* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh, Deputy Solicitor General Frey, Jerome M. Feit,* and *Robert H. Plaxico.*

*Louis Gilden* argued the cause and filed a brief for respondent.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

We granted certiorari in this case to consider the circumstances in which the Constitution requires that an indictment be dismissed because of delay between the commission of an offense and the initiation of prosecution.

I

On March 6, 1975, respondent was indicted for possessing eight firearms stolen from the United States mails, and for dealing in firearms without a license. The offenses were alleged to have occurred between July 25 and August 31, 1973, more than 18 months before the indictment was filed. Respondent moved to dismiss the indictment due to the delay.

The District Court conducted a hearing on respondent's motion at which the respondent sought to prove that the delay was unnecessary and that it had prejudiced his defense. In an effort to establish the former proposition, respondent presented a Postal Inspector's report on his investigation that was prepared one month after the crimes were com-

mitted, and a stipulation concerning the post-report progress of the probe. The report stated, in brief, that within the first month of the investigation respondent had admitted to Government agents that he had possessed and then sold five of the stolen guns, and that the agents had developed strong evidence linking respondent to the remaining three weapons.[1] The report also stated, however, that the agents had been unable to confirm or refute respondent's claim that he had found the guns in his car when he returned to it after visiting his son, a mail handler, at work.[2] The stipulation into which the Assistant United States Attorney entered indicated that little additional information concerning the crimes was uncovered in the 17 months following the preparation of the Inspector's report.[3]

To establish prejudice to the defense, respondent testified that he had lost the testimony of two material witnesses due to the delay. The first witness, Tom Stewart, died more than a year after the alleged crimes occurred. At the hearing

---

[1] The report indicated that the person to whom respondent admitted selling five guns had told Government agents that respondent had actually sold him eight guns which he, in turn, had sold to one Martin Koehnken. The report also indicated that Koehnken had sold three of these guns to undercover federal agents and that a search of his house had uncovered four others. Finally the report stated that the eighth gun was sold by one David Northdruft (or Northdurft) to Government agents, and that Northdruft claimed Koehnken had sold him the gun.

At the hearing on the motion to dismiss, respondent for the first time admitted that he had possessed and sold eight guns.

[2] The only contrary evidence came from respondent's purchaser who told the Government investigators that he knew the guns were "hot."

[3] In March 1975, the Inspector learned of another person who claimed to have purchased a gun from respondent. App. 18. At the hearing the parties disagreed as to whether this evidence would have been admissible since it did not involve any of the guns to which the indictment related. *Id.*, at 9–10. In any event, the Assistant United States Attorney stated that the decision to prosecute was made before this additional piece of evidence was received. *Id.*, at 19.

respondent claimed that Stewart had been his source for two or three of the guns. The second witness, respondent's brother, died in April 1974, eight months after the crimes were completed. Respondent testified that his brother was present when respondent called Stewart to secure the guns, and witnessed all of respondent's sales. Respondent did not state how the witnesses would have aided the defense had they been willing to testify.[4]

The Government made no systematic effort in the District Court to explain its long delay. The Assistant United States Attorney did expressly disagree, however, with defense counsel's suggestion that the investigation had ended after the Postal Inspector's report was prepared. App. 9–10. The prosecutor also stated that it was the Government's theory that respondent's son, who had access to the mail at the railroad terminal from which the guns were "possibly stolen," id., at 17, was responsible for the thefts, id., at 13.[5] Finally, the prosecutor elicited somewhat cryptic testimony from the Postal Inspector indicating that the case "as to these particular weapons involves other individuals"; that information had been presented to a grand jury "in regard to this case other than . . . [on] the day of the indictment itself"; and that he had spoken to the prosecutors about the case on four or five occasions. Id., at 20.

Following the hearing, the District Court filed a brief opinion and order. The court found that by October 2, 1973, the date of the Postal Inspector's report, "the Government had

---

[4] Respondent admitted that he had not mentioned Stewart to the Postal Inspector when he was questioned about his source of the guns. He explained that this was because Stewart "was a bad tomato" and "was liable to take a shot at me if I told [on] him." Id., at 13. Respondent also conceded that he did not mention either his brother's or Stewart's illness or death to the Postal Inspector on the several occasions in which respondent called the Inspector to inquire about the status of the probe.

[5] The Inspector's report had stated that there was no evidence establishing the son's responsibility for the thefts.

all the information relating to defendant's alleged commission of the offenses charged against him," and that the 17-month delay before the case was presented to the grand jury "had not been explained or justified" and was "unnecessary and unreasonable." The court also found that "[a]s a result of the delay defendant has been prejudiced by reason of the death of Tom Stewart, a material witness on his behalf." Pet. for Cert. 14a. Accordingly, the court dismissed the indictment.

The Government appealed to the United States Court of Appeals for the Eighth Circuit. In its brief the Government explained the months of inaction by stating:

"[T]here was a legitimate Government interest in keeping the investigation open in the instant case. The defendant's son worked for the Terminal Railroad and had access to mail. It was the Government's position that the son was responsible for the theft and therefore further investigation to establish this fact was important.

". . . Although the investigation did not continue on a full time basis, there was contact between the United States Attorney's office and the Postal Inspector's office throughout . . . and certain matters were brought before a Federal Grand Jury prior to the determination that the case should be presented for indictment . . . ." Brief for United States in No. 75–1852 (CA8), pp. 5–6.

The Court of Appeals accepted the Government's representation as to the motivation for the delay, but a majority of the court nevertheless affirmed the District Court's finding that the Government's actions were "unjustified, unnecessary, and unreasonable." 532 F. 2d 59, 61 (1976). The majority also found that respondent had established that his defense had been impaired by the loss of Stewart's testimony because it understood respondent to contend that "were Stewart's testimony available it would support [respondent's] claim that he did not know that the guns were stolen from the United States

mails." *Ibid.* The court therefore affirmed the District Court's dismissal of the three possession counts by a divided vote.[6]

We granted certiorari, 429 U. S. 884, and now reverse.[7]

## II

In *United States* v. *Marion,* 404 U. S. 307 (1971), this Court considered the significance, for constitutional purposes, of a lengthy preindictment delay. We held that as far as the Speedy Trial Clause of the Sixth Amendment is concerned, such delay is wholly irrelevant, since our analysis of the language, history, and purposes of the Clause persuaded us that only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the particular protections" of

---

[6] The court unanimously reversed the dismissal of a fourth count of the indictment charging respondent with dealing in firearms without a license since respondent had not alleged that the missing witnesses could have provided exculpatory evidence on this charge.

[7] In addition to challenging the Court of Appeals' holding on the constitutional issue, the United States argues that the District Court should have deferred action on the motion to dismiss until after trial, at which time it could have assessed any prejudice to the respondent in light of the events at trial. This argument, however, was not raised in the District Court or in the Court of Appeals. Absent exceptional circumstances, we will not review it here. See, *e. g., Duignan* v. *United States,* 274 U. S. 195, 200 (1927); *Neely* v. *Martin K. Eby Constr. Co.,* 386 U. S. 317, 330 (1967).

At oral argument, the Government seemed to suggest that its failure to raise the procedural question in its brief in the Court of Appeals should be excused because the proceedings in that court were "skewed" by the fact that the District Court had based its dismissal solely on Fed. Rule Crim. Proc. 48 (b), and because the issue was raised by the Government in its petition for rehearing. Tr. of Oral Arg. 7–8, 51. But even assuming that the basis for the District Court's dismissal could have "skewed" appellate proceedings regarding the procedural question, the fact is that the opening paragraph of the argument in the Government's brief below recognized that the only issue before the court was a due process question,

that provision. *Id.*, at 320.[8] We went on to note that statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide " 'the primary guarantee against bringing overly stale criminal charges.' " *Id.*, at 322, quoting *United States* v. *Ewell*, 383 U. S. 116, 122 (1966). But we did acknowledge that the "statute of limitations does not fully define [defendants'] rights with respect to the events occurring prior to indictment," 404 U. S., at 324, and that the Due Process Clause has a limited role to play in protecting against oppressive delay.

Respondent seems to argue that due process bars prosecution whenever a defendant suffers prejudice as a result of preindictment delay. To support that proposition respondent relies on the concluding sentence of the Court's opinion in *Marion* where, in remanding the case, we stated that "[e]vents of the trial may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." *Id.*, at 326. But the quoted sentence establishes only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid. Indeed, two pages earlier in the opinion we expressly rejected the argument respondent advances here:

"[W]e need not . . . determine when and in what circumstances actual prejudice resulting from preaccusation delays requires the dismissal of the prosecution. Actual

and the remainder of the brief treated that question on the merits. And even after the Court of Appeals issued its decision based solely on the Due Process Clause, the Government's petition for rehearing did not squarely raise the procedural issue as an alternative ground for rehearing the case en banc.

[8] *Marion* also holds that Fed. Rule Crim. Proc. 48 (b), which permits district courts to dismiss indictments due to preindictment or postindictment delay, is "limited to post-arrest situations." 404 U. S., at 319. Since respondent was not arrested until after he was indicted, the District Court plainly erred in basing its decision on this Rule.

prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Id.,* at 324–325. (Footnotes omitted.)

Thus *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

The Court of Appeals found that the sole reason for the delay here was "a hope on the part of the Government that others might be discovered who may have participated in the theft . . . ." 532 F. 2d, at 61. It concluded that this hope did not justify the delay, and therefore affirmed the dismissal of the indictment. But the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin* v. *California,* 342 U. S. 165, 170 (1952). Our task is more circumscribed. We are to determine only whether the action complained of—here, compelling respondent to stand trial after the Government delayed indictment to investigate further—violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935), and which define "the community's sense of fair play and decency," *Rochin* v. *California, supra,* at 173. See also *Ham* v. *South Carolina,* 409 U. S. 524, 526 (1973); *Lisenba* v. *California,* 314 U. S. 219, 236 (1941); *Hebert* v. *Louisiana,* 272 U. S. 312, 316 (1926); *Hurtado* v. *California,* 110 U. S. 516, 535 (1884).

It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of

justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause.[9]  It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.  To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," *United States* v. *Ewell, supra,* at 120.  From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried.[10]  These costs are by no means insubstantial since, as we recognized in *Marion,* a formal accusation may "interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."  404 U. S., at 320.  From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt im-

---

[9] ABA Code of Professional Responsibility DR 7–103 (A) (1969); ABA Project on Standards for Criminal Justice, The Prosecution Function § 3.9 (App. Draft 1971).

[10] To the extent that the period between accusation and trial has been strictly limited by legislative action, see, *e. g.,* Speedy Trial Act of 1974, 88 Stat. 2076, 18 U. S. C. § 3161 *et seq.* (1970 ed., Supp. V), compelling immediate prosecutions upon probable cause would not add to the time during which defendants stand accused, but would create a risk of guilty persons escaping punishment simply because the Government was unable to move from probable cause to guilt beyond a reasonable doubt in the short time available to it.  Even absent a statute, of course, the Speedy Trial Clause of the Sixth Amendment imposes restraints on the length of post-accusation delay.

possible by causing potentially fruitful sources of information to evaporate before they are fully exploited.[11]   And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.[12]   Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.[13]

It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete.   Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause.

First, compelling a prosecutor to file public charges as soon as the requisite proof has been developed against one

---

[11] Cf. *United States* v. *Watson,* 423 U. S. 411, 431 (1976) (POWELL, J., concurring) ("Good police practice often requires postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury").

[12] Defendants also would be adversely affected by trials involving less than all of the criminal acts for which they are responsible, since they likely would be subjected to multiple trials growing out of the same transaction or occurrence.

[13] See also *Hoffa* v. *United States,* 385 U. S. 293, 310 (1966), quoted in *United States* v. *Marion,* 404 U. S., at 325 n. 18:

"There is no constitutional right to be arrested.   The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.   Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."

participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

Second, insisting on immediate prosecution once sufficient evidence is developed to obtain a conviction would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted—prosecutions. The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions. In the instant case, for example, since respondent admitted possessing at least five of the firearms, the primary factual issue in dispute was whether respondent knew the guns were stolen as required by 18 U. S. C. § 1708. Not surprisingly, the Postal Inspector's report contained no direct evidence bearing on this issue. The decision whether to prosecute, therefore, required a necessarily subjective evaluation of the strength of the circumstantial evidence available and the credibility of respondent's denial. Even if a prosecutor concluded that the case was weak and further investigation appropriate, he would have no assurance that a reviewing court would agree. To avoid the risk that a subsequent indictment would be dismissed for preindictment delay, the prosecutor might feel constrained to file premature charges, with all the disadvantages that would entail.[14]

---

[14] In addition, if courts were required to decide in every case when the prosecution should have commenced, it would be necessary for them to

Finally, requiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases. The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest.[15] Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment. Again the instant case provides a useful illustration. Although proof of the identity of the mail thieves was not necessary to convict respondent of the possessory crimes with which he was charged, it might have been crucial in assessing respondent's culpability, as distinguished from his legal guilt. If, for example, further investigation were to show that respondent had no role in or advance knowledge of the theft and simply

---

trace the day-by-day progress of each investigation. Maintaining daily records would impose an administrative burden on prosecutors, and reviewing them would place an even greater burden on the courts. See also *United States* v. *Marion, supra,* at 321 n. 13.

[15] See, *e. g.,* The Prosecution Function, *supra,* n. 9, at § 3.9 (b):

"The prosecutor is not obliged to present all charges which the evidence might support. The prosecutor may in some circumstances and for good cause consistent with the public interest decline to prosecute, notwithstanding that evidence may exist which would support a conviction. Illustrative of the factors which the prosecutor may properly consider in exercising his discretion are:

"(i) the prosecutor's reasonable doubt that the accused is in fact guilty;

"(ii) the extent of the harm caused by the offense;

"(iii) the disproportion of the authorized punishment in relation to the particular offense or the offender;

"(iv) possible improper motives of a complainant;

"(v) reluctance of the victim to testify;

"(vi) cooperation of the accused in the apprehension or conviction of others;

"(vii) availability and likelihood of prosecution by another jurisdiction."

agreed, out of paternal loyalty, to help his son dispose of the guns once respondent discovered his son had stolen them, the United States Attorney might have decided not to prosecute, especially since at the time of the crime respondent was over 60 years old and had no prior criminal record.[16] Requiring prosecution once the evidence of guilt is clear, however, could prevent a prosecutor from awaiting the information necessary for such a decision.

We would be most reluctant to adopt a rule which would have these consequences absent a clear constitutional command to do so. We can find no such command in the Due Process Clause of the Fifth Amendment. In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States* v. *Marion,* 404 U. S., at 324, precisely because investigative delay is not so one-sided.[17] Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith* v. *United States,*

---

[16] Of course, in this case further investigation proved unavailing and the United States Attorney ultimately decided to prosecute based solely on the Inspector's report. But this fortuity cannot transform an otherwise permissible delay into an impermissible one.

[17] In *Marion* we noted with approval that the Government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here, Brief for United States 32, and expands it somewhat by stating: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," *id.,* at 32–33, n. 25. As the Government notes, however, there is no evidence of recklessness here.

360 U. S. 1, 10 (1959). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

In the present case, the Court of Appeals stated that the only reason the Government postponed action was to await the results of additional investigation. Although there is, unfortunately, no evidence concerning the reasons for the delay in the record, the court's "finding" is supported by the prosecutor's implicit representation to the District Court, and explicit representation to the Court of Appeals, that the investigation continued during the time that the Government deferred taking action against respondent. The finding is, moreover, buttressed by the Government's repeated assertions in its petition for certiorari, its brief, and its oral argument in this Court, "that the delay was caused by the government's efforts to identify persons in addition to respondent who may have participated in the offenses." Pet. for Cert. 14.[18] We must assume that these statements by counsel have been made in good faith. In light of this explanation, it follows that compelling respondent to stand trial would not be fundamentally unfair. The Court of Appeals therefore erred in affirming the District Court's decision dismissing the indictment.

## III

In *Marion* we conceded that we could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions. 404 U. S., at 324. More than five years later, that statement remains true. Indeed, in the intervening years so few defendants have established that they were prejudiced by delay that neither this Court

---

[18] See also Pet. for Cert. 4, 8; Brief for United States 3, 8, 38; Tr. of Oral Arg. 4, 7, 10, 47.

nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay.[19] We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases. We simply hold that in this case the lower courts erred in dismissing the indictment.

*Reversed.*

MR. JUSTICE STEVENS, dissenting.

If the record presented the question which the Court decides today, I would join its well-reasoned opinion. I am unable

---

[19] Professor Amsterdam has catalogued some of the noninvestigative reasons for delay:

"[P]roof of the offense may depend upon the testimony of an undercover informer who maintains his 'cover' for a period of time before surfacing to file charges against one or more persons with whom he has dealt while disguised. . . . [I]f there is more than one possible charge against a suspect, some of them may be held back pending the disposition of others, in order to avoid the burden upon the prosecutor's office of handling charges that may turn out to be unnecessary to obtain the degree of punishment that the prosecutor seeks. There are many other motives for delay, of course, including some sinister ones, such as a desire to postpone the beginning of defense investigation, or the wish to hold a 'club' over the defendant.

"Additional reasons for delay may be partly or completely beyond the control of the prosecuting authorities. Offenses may not be immediately reported; investigation may not immediately identify the offender; an identified offender may not be immediately apprehendable. . . . [A]n indictment may be delayed for weeks or even months until the impaneling of the next grand jury. It is customary to think of these delays as natural and inevitable . . . but various prosecutorial decisions—such as the assignment of manpower and priorities among investigations of known offenses—may also affect the length of such delays." Speedy Criminal Trial: Rights and Remedies, 27 Stan. L. Rev. 525, 527–728 (1975).

See also *Dickey* v. *Florida*, 398 U. S. 30, 45–46, n. 9 (1970) (BRENNAN, J., concurring).

to do so because I believe our review should be limited to the facts disclosed by the record developed in the District Court and the traditional scope of review we have exercised with regard to issues of fact.

After a thorough hearing on the respondent's motion to dismiss the indictment for prejudicial preindictment delay— a hearing at which both sides were given every opportunity to submit evidence concerning the question—the District Court found that "[t]he Government's delay ha[d] not been explained or justified and [was] unnecessary and unreasonable." On appeal, the Court of Appeals concurred, noting that the District Court's determination was "supported by the evidence." 532 F. 2d 59, 60–61 (CA8 1976). These concurrent findings of fact make it improper, in my judgment, for this Court to make its own determination that "the Government postponed action . . . to await the results of additional investigation," *ante*, at 796.[1]

That determination is not supported by the record.[2] The

---

[1] It is a settled rule of this Court that we will not review concurrent findings of fact by two courts " 'in the absence of a very obvious and exceptional showing of error.' " *Berenyi* v. *Immigration Director*, 385 U. S. 630, 635, citing *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275. Mr. Justice Jackson has called this a "seasoned and wise rule . . . ." *Comstock* v. *Group of Investors*, 335 U. S. 211, 214.

[2] An examination of the transcript of the District Court hearing reveals that the Government produced *no evidence* as to why the indictment was delayed. The Government stipulated that it proceeded before the grand jury only on evidence collected some 17 months before the presentation and that no additional evidence had caused it to proceed. Although the Court of Appeals surmised that "[n]o reason existed for the delay except a hope on the part of the Government that others might be discovered who may have participated in the theft[s] . . . ," 532 F. 2d, at 61, even this assumption is not borne out by the record of the District Court hearing. Although not under oath, the prosecuting attorney indicated that the Government theorized that the guns in question came from the respondent's son, who worked at a freight terminal and would have had access to the mails. Yet even this theory was never shown to be the cause of the delay. Not even the prosecuting attorney stated as much.

majority opinion correctly points out that there was "no evidence concerning the reasons for delay in the record," and yet proceeds to accept as fact the representations in the Government's briefs to the Court of Appeals and to this Court that " 'the delay was caused by the government's efforts to identify persons in addition to respondent who may have participated in the offenses.' " *Ibid.* This finding of a continuing investigation, which forms the foundation of the majority opinion, comes from statements of counsel made during the appellate process. As we have said of other unsworn statements which were not part of the record and therefore could not have been considered by the trial court: "Manifestly, [such statements] cannot be properly considered by us in the disposition of [a] case." *Adickes* v. *Kress & Co.*, 398 U. S. 144, 157–158, n. 16. While I do not question the good faith of Government counsel, it is not the business of appellate courts to make decisions on the basis of unsworn matter not incorporated in a formal record.

The findings of the District Court, as approved by the Court of Appeals, establish four relevant propositions: (1) this is a routine prosecution; (2) after the Government assembled all of the evidence on which it expects to establish respondent's guilt, it waited almost 18 months to seek an indictment; (3) the delay was prejudicial to respondent's defense; and (4) no reason whatsoever explains the delay. We may reasonably infer that the prosecutor was merely busy with other matters that he considered more important than this case.

The question presented by those facts is not an easy one. Nevertheless, unless we are to conclude that the Constitution imposes no constraints on the prosecutor's power to postpone the filing of formal charges to suit his own convenience, I believe we must affirm the judgment of the Court of Appeals. A contrary position "can be tenable only if one assumes that the constitutional right to a fair hearing includes no right

whatsoever to a prompt hearing." *Moody* v. *Daggett,* 429 U. S. 78, 91 (STEVENS, J., dissenting). The requirement of speedy justice has been part of the Anglo-American common-law tradition since the Magna Carta. See *id.,* at 92 n. 5. It came to this country and was embodied in the early state constitutions, see the Massachusetts Constitution of 1780, Part I, Art. XI, and later in the Sixth Amendment to the United States Constitution. As applied to this case, in which respondent made numerous anxious inquiries of the Postal Inspectors concerning whether he would be indicted, in which the delay caused substantial prejudice to the respondent, and in which the Government has offered no justification for the delay, the right to speedy justice should be honored.

If that right is not honored in a case of this kind, the basic values which the Framers intended to protect by the Sixth Amendment's guarantee of a speedy trial, and which motivated Congress to enact the Speedy Trial Act of 1974, will become nothing more than managerial considerations for the prosecutor to manipulate.

I respectfully dissent.