David R. WILSON, Sr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–1948.

Court of Appeals of Alaska.

June 3, 1988.

Charles W. Ray, Jr., Ann K. Stokes, Bradbury, Bliss & Riordan, Anchorage, for appellant.

Mary Jane Sutliff, Asst. Dist. Atty., Dwayne W. McConnell, Dist. Atty., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

1. Alaska Statute 12.36.040 provides:
   When the owner of property is unknown and the property comes into the possession of a law enforcement agency as suspected evidence of a crime but is not used in a criminal proceeding or a children's court proceeding, or when the property comes into the possession of a law enforcement agency by other

## OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

SINGLETON, Judge.

David R. Wilson, Sr. was convicted of commercial crab fishing before the season opened, in violation of 5 AAC 34.810(b). He appeals, contending that the trial court erred by failing to dismiss the prosecution for pre-accusation delay, by admitting hearsay evidence at trial in violation of Wilson's constitutional right to confrontation, and by imposing an excessive sentence. We affirm Wilson's conviction but remand for resentencing.

## FACTS

On September 28, 1984, the WOLSTAD, an Alaska Department of Fish and Game (ADF & G) patrol vessel, while on routine patrol, discovered twenty-eight baited crab pots in Bristol Bay, just north of Port Moller. Each pot contained approximately 300 to 350 red king crabs. Of those crabs, however, only about ten to twenty in each pot would have been legal to keep and sell.

It appears that crab pots are normally attached to two or three buoys. One buoy must bear an ADF & G number, indicating the vessel to which the pot belongs. The pots in this case were attached to single buoys which did not bear the required ADF & G numbers, rendering ownership of the pots uncertain. The pots themselves, however, did have numbers on them. Apparently, some of these numbers were ADF & G numbers and others were numbers privately chosen by their owners for identification purposes.

The WOLSTAD released the crabs and took the pots to Dutch Harbor. Whenever the state seizes property and the owner is unknown, it must store the property for two years. AS 12.36.040.[1] Preparatory to

means, the property shall be held for two years. If the property is not claimed within two years of the date it comes into the possession of a law enforcement agency, the property shall be disposed of as provided in 12.36.030(b).

undertaking this responsibility, the state troopers inventoried the pots. As the pots were being unloaded in Dutch Harbor on October 1, 1984, Trooper Harris read off some of the numbers that were on the pots and Trooper Nygren wrote down this information. Trooper Nygren also examined some of them himself. This list became Plaintiff's Exhibit 5 at trial and was not double-checked by Trooper Harris. He relied on it, however, to formulate his official evidence log of the seized pots.

Investigation into ownership of the pots was started in Dutch Harbor on or about October 1, 1984, by Trooper Low. Captain Lockman of the WOLSTAD suggested to Trooper Low that the pots might belong to the JUPITER or the MARY JANE or both, two ships which had either sunk or run aground prior to October 1984. Trooper Low determined that the pot number[2] for the JUPITER was 35 and that the pot number for the MARY JANE was 6433. He then discovered that there were some pots seized by the WOLSTAD with numbers that matched the numbers of the JUPITER and the MARY JANE. Trooper Low put this information into a memorandum and, in October 1984, sent copies to Captain Lockman of the WOLSTAD, Sergeant Smithson, who was in charge of the trooper station in Kodiak, and Trooper Mumford, who was in charge of the trooper station in Sand Point. Trooper Low also included information about the KETA, as well as the JUPITER and MARY JANE, because all three vessels were owned, at least partly, by David Wilson and Louis Bernstein.

From the time of Trooper Low's memorandum in October 1984, until March 1985, the investigation was dormant. Sergeant Smithson, who was responsible for the case, did not testify at the evidentiary hear-

ing. It appears that he simply waited for someone to come in and claim the lost pots. On March 15, 1985, Sergeant Smithson assigned the investigation to Trooper Lovett in Kodiak. Trooper Lovett was given the evidence log listing the seized pots and a one-page report from Trooper Harris detailing the actual seizure of the pots. Trooper Lovett understood that the case was something of a "dead case," and that he should look into it and, if appropriate, close the case. He contacted Trooper Low and obtained the information that Low had previously developed. Thereafter, Trooper Lovett concentrated on the KETA as the possible source of the illegally fished crab pots.

Trooper Lovett charted the location of the pots at the time they were found by the WOLSTAD. He then obtained a search warrant and seized certain "fish tickets"[3] in Kodiak showing that the KETA had fished in the same general area where the pots were and at approximately the same time that they were found. He obtained this information on April 3, 1985. Trooper Lovett also learned that Wilson had been the skipper of the KETA at that time. He obtained a warrant to search the KETA on April 12, 1985. Troopers Edmond and Low served the warrant in Dutch Harbor on April 20, 1985. Approximately one week later, Trooper Lovett received certain log books seized from the KETA.

One of the logs confirmed that the KETA had been in the area where the pots were found at approximately that time. Further review of the seized material showed that the KETA had begun fishing with 242 pots, but had returned with only 204 pots. Trooper Lovett did not review this material until November 1985. He indicated that other duties prevented him from reviewing the material until Novem-

Alaska Statute 12.36.030(b) provides procedures for disposing of property and depositing the proceeds with the state.

**2.** These "pot numbers" are different from the ADF & G numbers. There is no requirement that the pots be numbered, but some fishermen use such numbers, and records are apparently kept of the ships that use particular numbers on their pots. These numbers are also referred to

in the record as ADF & G numbers. In any event, they matched numbers on the pots to numbers associated with the JUPITER and the MARY JANE.

**3.** It appears that fishing vessels are required to fill out fish tickets, indicating where they fished and what they caught, when they sell their catch.

ber, although the material was seized in April.

In November 1985, after reviewing the seized material, Trooper Lovett wrote a criminal complaint for Wilson and filed it in Kodiak. It was discovered, however, that this was an improper venue, and therefore Trooper Edmond later filed a complaint in Dutch Harbor. Trooper Mumford was thereafter instructed to serve the complaint on Wilson. His periodic attempts to do so were unsuccessful until May 1986, because Wilson was in Seattle having his vessel repaired.

The jury trial on this matter began on November 18, 1986, and concluded the following day. Wilson was ultimately fined $130,000, sentenced to serve 180 days with 150 days suspended, and placed on probation for two years.

## DISCUSSION

### Pre-accusation Delay

■ The illegal crab pots were discovered on or before October 1, 1984. Thirteen months later, in November 1985, a criminal complaint was filed against David Wilson. Wilson was served in May 1986, and tried in November 1986, almost two years after discovery of the illegal crab pots. Because the alleged offense was discovered on or before October 1, 1984, and the original charge was brought on November 15, 1985, roughly thirteen months later, Wilson argues that he was deprived of due process of law through pre-accusation delay.[4]

State and federal courts have frequently considered this issue. *See United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Burke v. State,* 624 P.2d 1240 (Alaska 1980); *Alexander v. State,* 611 P.2d 469 (Alaska 1980); *Dixon v. State,* 605 P.2d 882 (Alaska 1980); *Prenesti v. State,* 594 P.2d 63 (Alaska 1979); *Coffey v. State,*

585 P.2d 514 (Alaska 1978), *modified on rehearing sub nom. State v. Glass,* 596 P.2d 10 (Alaska 1979); *Yarbor v. State,* 546 P.2d 564 (Alaska 1976); *Tarnef v. State,* 512 P.2d 923 (Alaska 1973); *P.H. v. State,* 504 P.2d 837 (Alaska 1972); *Marks v. State,* 496 P.2d 66 (Alaska 1972); *McKay v. State,* 489 P.2d 145 (Alaska 1971). In discussing the appropriate test to apply, the Supreme Court of Alaska has said:

"Two factors are to be considered under both federal and state law: (1) the reasonableness of the delay and (2) the resulting harm to the accused."

Although [the] burden of proof is on the defendant to show the absence of a valid reason for the delay and the fact of prejudice, the state has the burden, once the issue is raised, to come forward with reasons for the delay. Once reasons are advanced, the defendant must show that they do not justify the delay.

*Burke,* 624 P.2d at 1242–43 (quoting *Coffey,* 585 P.2d at 519). *But see P.H. v. State,* 504 P.2d at 847 (where no attempt was made to establish the facts concerning the reasons for a seven and one-half months' delay between the date of the offense and the charge or its effect on the defendant, the claim fails).

The parties disagree as to precisely which period of time should be considered in determining the reasonableness of the delay. The state argues that we must focus on the period of time that elapses after the state has determined that it has sufficient evidence to prove guilt beyond a reasonable doubt. The state contends that it was not convinced that it had sufficient evidence to prove Wilson's guilt beyond a reasonable doubt until Trooper Lovett reviewed the results of the search of the KETA in November 1985. The state's position finds support in *Tarnef.* 512 P.2d at 931 & n. 14.

4. The right to be free of prejudicial pre-accusation delay is based on the due process clauses of the state and federal constitutions, *see* U.S. Const. amend. XIV; Alaska Const. art. 1, § 7, and not on the right to a speedy trial which does not attach until the commencement of formal proceedings. *See* U.S. Const. amend. VI; Alaska Const. art. 1, § 11; *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Burke v. State,* 624 P.2d 1240, 1242–43 n. 1 (Alaska 1980).

Wilson argues for a broader rule. In his view, the state is under a duty to exercise reasonable care to investigate crimes from the time of their first discovery until someone is ultimately charged. According to Wilson, the entire period elapsing from October 1984, until the charge was first filed in November 1985, must be considered. There is *dicta* in some Alaska cases supporting Wilson's position. *See, e.g., Burke,* 624 P.2d at 1245 (cautioning against long-term inactivity or a pattern of lack of prompt investigations). It is unnecessary for us to decide this issue, however, because the supreme court has made it clear that even if there is no reason advanced for the delay, the defendant must still show actual and substantial prejudice in order to prevail, and Wilson has not made such a showing. *See Dixon,* 605 P.2d at 891–92; *Prenesti,* 594 P.2d at 64–65.

The supreme court has never been completely clear regarding what constitutes prejudice. The only case in which a reversal was ordered was *Marks.* In *Marks,* the state conceded error and, more significantly, conceded that the defendant made a *prima facie* showing of prejudice. 496 P.2d at 69. The court has noted that it gave this concession great weight. *See Dixon,* 605 P.2d at 892 n. 25. At the very least, Wilson must show that but for the delay, he would have been able to present favorable evidence. Mere speculation about the loss of favorable evidence is insufficient.

Wilson relies on four considerations in support of his claim of prejudice. He contends: (1) that one member of his crew on the KETA could not be called as a witness because his whereabouts were no longer known, (2) that the memories of all the witnesses would surely have faded, (3) that it would be difficult to locate other boats that might have seen where the KETA was fishing during the time period in question, and (4) that when he testified at trial, Borge Larson, an employee of Peter Pan Seafoods, was unable to recall whether Wilson had dropped off twenty-one pots in False Pass in October 1984, which would provide an impartial explanation of why the KETA returned with thirty-eight fewer pots than it left with that season.

Wilson's contentions are clearly insufficient to show prejudice under prior Alaska Supreme Court decisions. Wilson admitted that there were two other members of his crew, who are not members of his family, who would have been available to testify at trial had he wished to present them. He indicated that he did not seek them out because he assumed that the case would never go to trial. Moreover, there is nothing in the record to suggest that the unavailable witnesses would have been more favorable to Wilson than those who were available. Although the trial court noted that the memories of all of the witnesses would surely have faded during the thirteen months that elapsed between the commission of the offense and the filing of criminal charges, the supreme court has indicated that faded recollection is common to all criminal cases and the mere fact that witnesses' memories will fade with time is insufficient to establish prejudice. *Dixon,* 605 P.2d at 892; *Prenesti,* 594 P.2d at 65; *Yarbor,* 546 P.2d at 568.

Wilson's final claim of prejudice relates to Borge Larson, who was available to testify. Larson indicated that from time to time captains of vessels dropped off pots at the Peter Pan Seafood docks. Larson made no efforts to safeguard those pots, however, and he did not inventory them. He could not recall whether Wilson had dropped pots off in either 1985 or 1984. Wilson has failed to demonstrate that Larson would have given favorable testimony had the case been commenced at an earlier time.

In any event, the state offered to stipulate to the fact Wilson sought to prove through Larson, *i.e.,* that Wilson had dropped off twenty-one pots at the Peter Pan Seafood dock during the 1984 fishing season. This proffered stipulation would have virtually eliminated any risk of prejudice from Larson's inability to recall the 1984 season. *Burke,* 624 P.2d at 1246. The state's willingness to stipulate indicates that the prosecution did not consider the stipulation particularly harmful to its

own case, and supports the conclusion that Wilson was not prejudiced by any lapse in Larson's memory. The trial court did not accept the stipulation and did not inform the jury of it.

We therefore conclude that Wilson has not met the burden of showing substantial actual prejudice required for a dismissal based on pre-accusation delay.[5]

*Hearsay*

Wilson next argues that the trial court erred in admitting plaintiff's exhibits 3, 4, and 5. Exhibit 5 is a handwritten list of the type, buoy color, and buoy markings for each of the twenty-eight pots found by the WOLSTAD. Exhibits 3 and 4 were prepared from and are essentially the same as exhibit 5. Hence, the admissibility of all three exhibits depends on the admissibility of exhibit 5. Exhibit 5 was made by Sergeant Nygren as the pots were being offloaded in Dutch Harbor. Trooper Harris was unloading pots from the WOLSTAD with a crane, and Nygren was standing nearby. Apparently, the information about the pots was partly relayed to Nygren by Harris, and partly constituted Nygren's

own observations. Harris testified that he never double-checked Nygren's list. Nygren did not testify at trial.

Defense counsel objected to the admission of these exhibits at trial, claiming they were hearsay. The trial court ruled that exhibit 5, and consequently exhibits 3 and 4, were all hearsay, but that they were admissible under Alaska Evidence Rule 803. The court initially concluded that the exhibits were admissible as either business records of the state or public records. A.R.E. 803(6) and (8).[6] Thereafter, Wilson convinced the trial court that the exhibits were police reports, inadmissible under Rule 803(8). The court then amended its ruling to admit the exhibits under Rule 803(1), (6) and (23).

Wilson now argues that because Rule 803(8)(b) specifically precludes police reports and factual findings offered by the state in criminal cases from falling under the public records exception to the hearsay rule, that exhibit 5 should not come in under any exception. In support of this argument, he cites *United States v. Oates*, 560 F.2d 45 (2nd Cir.1977), which held that

5. We recognize that Judge Mason indicated that there was moderate prejudice in this case. It appears, however, from the context in which Judge Mason reached this ruling, that he was merely referring to the obvious fact that witnesses' memories fade over time, and the longer the time the greater the risk of faded memories. Judge Mason was not applying the actual prejudice test mandated by the United States Supreme Court and the supreme court of this state. *See Lavasco,* 431 U.S. at 789–90; *Dixon,* 605 P.2d at 892. We stress that we find Wilson's showing of prejudice insufficient as a matter of law and not as a matter of fact.

6. Rule 803(6) states:

*Business Records.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge acquired of a regularly conducted business activity, and if it was the regular practice of that business activity to make and keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstance of preparation indicates lack of trustworthiness [is admissible as an exception to the hearsay rule]. The term "business" as used in this paragraph includes

business, institution, association, profession, occupation, and calling of every kind whether or not conducted for profit.

Rule 803(8) states, in pertinent part:

*Public Records and Reports.* (a) To the extent not otherwise provided in (b) of this subdivision, records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law [are admissible as an exception to the hearsay rule].

(b) The following are not within this exception to the hearsay rule: (i) investigative reports by police and other law enforcement personnel; (ii) investigative reports prepared by or for a government, a public office or an agency when offered by it in a case in which it is a party; (iii) factual findings offered by the state in criminal cases; (iv) factual findings resulting from special investigation of a particular complaint, case, or incident; (v) any matter to which the sources of information or other circumstance indicate lack of trustworthiness....

evidence inadmissible under Federal Rule of Evidence 803(8)(b) could not be admissible under Rule 803(6).

We reached a contrary conclusion in *State v. Huggins,* 659 P.2d 613, 615–17 (Alaska App.1982), and *Byrne v. State,* 654 P.2d 795, 796–97 (Alaska App.1982). In those cases we authorized the admission of certain factual findings under the public records exception, concluding that the business records of state agencies did not necessarily fall within the exclusions of Rule 803(8)(b). We also noted that the commentary to the evidence rules suggests that evidence, inadmissible as a public record because of the limitations on the exception in that rule, might nevertheless be admissible as a business record. *See Huggins,* 659 P.2d at 615 n. 3.; *Byrne,* 654 P.2d at 796.

■■■ The same reasoning persuades us that Judge Mason did not abuse his discretion in admitting exhibit 5 into evidence in this case. Harris and Nygren were performing a ministerial task in recording information regarding the pots for purposes of their identification and safekeeping. *See Wester v. State,* 528 P.2d 1179, 1180–83 (Alaska 1974). There is nothing in the record to suggest a motive to falsify, and inasmuch as the state was obligated by law to retain the pots for at least two years or until claimed, any errors in recording markings on the pots could easily be ascertained through discovery. *Byrne,* 654 P.2d at 797. Wilson did not contend at trial and does not contend on appeal that exhibit 5 is inaccurate. Wilson's access to exhibit 5 through discovery prior to trial and his access to the pots to verify the information in exhibit 5, provides sufficient guarantee

of reliability, in the absence of a claim of inaccuracy, to ensure protection to his right of confrontation. U.S. Const. amend. VI; Alaska Const. art. 1, § 11.[7]

### Sentence

Although he attacks his entire sentence in passing, Wilson focuses his attention on the fine imposed. He challenges it on three grounds. First, he argues that because he is a first offender with no past criminal record, the trial court should not have imposed a substantial fine without previously considering whether Wilson was a worst offender. We rejected a similar argument in *Ashton v. State,* 737 P.2d 1365, 1366 n. 1 (Alaska App. 1987), in which we said:

> It is true that a maximum prison sentence should not be imposed unless the defendant can be properly termed a worst offender (citation omitted). However, different rules govern the imposition of fines, which are essentially calculated on the basis of ability to pay. *See, e.g.,* AS 12.55.035. A maximum fine does not necessarily indicate that the defendant is a "worst offender."

■■■ A fine must not be totally disproportionate to the offense. *See Veco International Inc. v. The Alaska Public Offices Comm.,* 753 P.2d 703, 716 (Alaska 1988). Nevertheless, within constitutional limits, the offender's ability to pay and the need to deter, not relative culpability, should determine the amount of a fine.

Second, Wilson argues that the trial court improperly applied AS 16.05.720.[8]

---

7. The sixth amendment to the United States Constitution provides in part:

 In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him.

 Article 1, section 11 of the Alaska Constitution provides in part:

 In all criminal prosecutions, the accused ... is entitled to ... be confronted with the witnesses against him.

 If evidence "falls within a firmly routed hearsay exception," it's admission does not violate the confrontation clause. *Bourjaily v. United States,* — U.S. ——, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987).

8. AS 16.05.720 provides, in relevant part:

 (a) Except as modified by (c) of this section, a person who violates AS 16.05.480–16.05.690 or the regulations of the department pertaining to commercial fisheries is guilty of a misdemeanor and upon conviction is punishable by a fine of not more than $5,000, or by imprisonment for not more than one year, or by both.

 . . . .

 (c) A person who was convicted of commercial fishing in closed waters, commercial fishing during a closed period or season, or commercial fishing with unlawful gear including but not limited to nets, pots, tackle or

Wilson argues that the trial court incorrectly calculated "the gross value to the fisherman of the fish found ... at the fishing site at the time of the violation." AS 16.-05.720(c). The state disputes this contention. The controversy between the parties turns on whether undersized fish that could not legally be sold should be included in determining the gross value to the fisherman of the fish found at the fishing site. Judge Mason apparently included some value for undersized crab in the figures he calculated. He then imposed a fine equal to approximately three times the calculated value of the fish. It is clear, however, that Judge Mason did not predicate the fine on only the fair-market value of the crab, but on other considerations as well. We are satisfied that the record in this case is insufficient for us to resolve this issue at this time. We believe it is necessary to remand the case to Judge Mason for further findings of fact and conclusions of law.

The legislature apparently intended to treat fishing violations as the equivalent of class A misdemeanors and impose a maximum fine of $5,000. AS 12.55.035(b)(3); AS 16.05.720(a). It seems equally clear that the legislature intended an exception to this $5,000 maximum for certain offenses including the offense for which Wilson was convicted. If no fish are found, the maximum additional fine is $10,000. Where "fish are found on the vessel or at the fishing site" as a result of a fishing violation, minimum fines are prescribed, but it is not clear what maximum fine should apply. Unless a maximum fine can be inferred from AS 16.05.720(c), the maximum fines in AS 12.55.035 would govern.

The parties have not addressed the interplay between the maximum fines established in AS 12.55.035 and the minimum fines established in AS 16.05.720(c), or suggested what maximum fines are appropri-

ate. We consider this question a necessary predicate to ruling on the claim that the fine actually imposed was excessive.

Although the statutes are ambiguous regarding the maximum fine which may be imposed where "fish are found," we believe the statute can be reasonably interpreted, bearing in mind the requirement that ambiguous statutes be interpreted favorably to the defendant. *State v. Andrews,* 707 P.2d 900, 907 (Alaska App.1985), *aff'd,* 723 P.2d 85 (Alaska 1986).

■ In our view, the statute sets a maximum $10,000 additional fine. Where fish are found, the minimum fine is the value of the fish (for a third offender, three times the value of the fish). It is only where the value of the fish (or three times the value of the fish in the case of a third offender) exceeds $10,000 that the latter ceases to be the maximum additional penalty. In such cases, and in only such cases, we believe the legislature intended the maximum additional penalty for a first offender as well as the minimum penalty to be the value of the fish. In the case of a third offender, the maximum and minimum penalties might also be the same, three times the value of the fish.

■ In any event, we are satisfied that the legislature intended that the minimum fine be determined by the fair-market value of the fish actually taken in violation of law. In our view, the reference to "gross value to the fisherman" is intended to cover the situation in which the fisherman might have access to illegal markets such that the take would be more valuable to the fisherman than it would be to the community in general. It is necessary, however, that the trial court establish the fair-market value of the fish to the fisherman in order to impose the minimum fine. If the state contends that there was an illegal

---

other devices designed or employed to take fish commercially, is guilty of a misdemeanor and in addition to the penalty imposed under (a) of this section is punishable by a fine of not less than the gross value to the fisherman of the fish found on the vessel or at the fishing site at the time of the violation. Upon a third conviction of a person for a violation

of this subsection, and in addition to the forfeiture provision in AS 16.05.710, the fine shall be not less than three times the gross value to the fisherman of the fish found on the vessel or at the fishing site, or, if no fish are found on the vessel or at the fishing site, a fine of not more than $10,000.

market for undersized crab available to Wilson, thus enhancing the value of the total take to him, it should be required to prove that fact at a hearing on remand.

Wilson has not presented separate arguments establishing that his sentence of imprisonment was clearly mistaken. We therefore decline to address that part of his sentence.

The judgment of the district court is AFFIRMED, and this case REMANDED for resentencing.