**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry PARDUE, Defendant–Appellant.**

**No. 97–1730.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1997.

Decided Jan. 26, 1998.

Hilary W. Frooman (argued), Office of the United States Attorney, Urbana Division, Urbana, IL, for Plaintiff–Appellee.

Joellyn Nelson (argued), Glen Ellyn, IL, for Defendant–Appellant.

Before KANNE, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

On December 20, 1996, a jury found Jerry Pardue guilty of embezzlement and misapplication of bank funds. He was sentenced to 18 years imprisonment and ordered to pay $10,000 restitution. The only thing at all remarkable in the case is that the events occurred in 1986 and the indictment was returned almost 10 years later, just before the expiration of the statute of limitations. Predictably, Pardue contends that the indictment should have been dismissed because of prejudicial preindictment delay.

Pardue was indicted with Eldon Schoch, the president of the Mendon State Bank, and Eldon's brother Donald Schoch, the chairman of the bank's holding company. Both of the Schochs entered guilty pleas and testified at Pardue's trial.

Pardue was the chairman of Choice 2000, a company which presented itself to the bank as a business established to sell real estate throughout the country. When Choice 2000 began to receive loans from the Mendon State Bank, Pardue was aware that the bank had already reached its lending limit. Nevertheless, the company obtained a loan to purchase a site with the unlikely name of Lake Little Tweet. Choice 2000 did not generate sufficient funds to avoid a negative checking account balance from January 1986 until the bank closed in August 1986. Donald Schoch discussed the negative balance with Pardue, who nevertheless continued to write checks on the account.

Both Donald and Eldon Schoch personally borrowed $100,000 from the bank and transferred the funds to the Choice 2000 account. In addition, for the purpose of further fund-

ing Choice 2000, Pardue and the Schoch brothers formed E & D Financial, Inc., which unsuccessfully attempted to fund Choice 2000.

In constant need of funds, Pardue convinced some Choice 2000 employees to sign Mendon Bank promissory notes and to allow the company to have the use of the funds. In early March 1986 persons involved with Choice 2000 formed a corporation and obtained a $100,000 loan so that Choice 2000 could obtain a new building. In April 1986 Pardue personally signed for a $350,000 business loan and his financial officer signed for another $100,000 loan. Funds from Pardue's loan were used to cover Choice 2000 overdrafts, and funds from the financial officer's loan were applied to repay Pardue's loan. Also in April 1986, two other loans for $100,000 and two loans for $120,000 were made in the names of employees. Loan proceeds went to Choice 2000's checking account and to repay the loan for which the defendant signed. On June 30, 1986, Mendon Bank loaned an additional $420,000 which benefited Choice 2000 through loans to four individuals associated with the company.

In July 1986 the Schochs were aware that the loans constituted unsecured credit. But because Choice 2000 constantly required funds, John Kolp, the bank's consultant, and Pardue devised a plan by which the bank would loan funds to Choice 2000 associates and the funds would be used to purchase zero coupon bonds. Pardue had represented that a third party, whom he introduced to the bank, would then be willing to provide funds to Choice 2000 and, more importantly, pick up the loans currently at Mendon Bank. Donald Schoch had never worked with zero coupon bonds, and he did not realize that the Mendon Bank funds were being funneled directly into the account of the third party who was supposed to be providing financing to Choice 2000, with the result that the bonds were never delivered to the bank.

Although Donald Schoch did not, Pardue clearly understood how such bonds worked and explained them to his employees, one of whom recognized the problem with the bonds. The $350,000 loans were due in one year, and the bonds, which ostensibly were security on the loans, would not mature for 13 years. At maturity in 1999 the bonds, purchased for $140,000 each, would be worth only enough to pay the principal on the loans and were not nearly sufficient security for the loans made to purchase the bonds.

If that wasn't enough, six loans of $350,000 were made to others, ostensibly to establish Choice 2000 centers around the country. It should be no surprise by now to learn that the money went to make payments on loans and to the third-party bond purchaser, and that no Choice 2000 centers were ever established with the funds. Meanwhile, Choice 2000 continued to flood the bank with overdrafts.

By July 30, 1986, the Illinois Commissioner of Banks entered Mendon Bank. Again not surprisingly, the bank was closed shortly thereafter. But it wasn't until June 1996 that a federal grand jury returned an indictment charging Pardue, along with Donald and Eldon Schoch, in the present case. Prior to trial Donald Schoch moved to dismiss the indictment, claiming that delay in indictment had prejudiced his defense. Pardue adopted that motion on October 23, 1996.

The motion to dismiss noted the dates on which unlawful activity was alleged to have occurred and claimed a good faith defense, for which the testimony of bank consultant John Kolp was essential. Kolp, however, had died in 1989. Pardue claimed that it was Kolp who structured the first loan made to Choice 2000 and that the January 17, 1986, FDIC examination report recognized that Kolp was "significantly involved in all lending decisions of Mendon State Bank."

The district court denied the motion to dismiss because Pardue[1] failed to demon-

---

1. As we noted, Pardue adopted Donald Schoch's motion to dismiss the indictment. In denying the motion, the district court referred to the "defendant" without particularizing that term to Pardue. But this is not at all unusual when one piggybacks on a motion presented by a codefend-

ant. And here there is nothing that would indicate that the reasoning of the judge would have been altered if his decision had been particularized as to Pardue and not Donald Schoch. And beyond that, Pardue's posttrial motion to dismiss on the same grounds was particularized, and the

strate that preindictment delay resulted in concrete and substantial prejudice to him:

> Defendant has not shown that if Kolp were present and able to testify that he would testify as to Defendant's innocence, to Defendant's version of events, and/or to Defendant's good faith.... [I]f Kolp were still alive, he would in all likelihood be Defendant's co-defendant rather than his witness in this matter.

Finally, the court noted that it was

> not convinced that John Kolp's testimony would have withstood cross-examination or that the jury would have found him to be a credible witness had he been alive and able to give testimony on behalf of Defendant.

The case proceeded to trial. Following the guilty verdict Pardue filed a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The motion, however, was really a supplement to the pretrial motion to dismiss the indictment. He again sought dismissal of the indictment, this time asserting that, in addition to Kolp, several other potential witnesses who could have assisted his defense were also dead:

> Michael Crocker testified at the trial that it was Ray Grisham not the Defendant, Jerry Pardue, who approached him and solicited him to execute the loan documents referred in Count 5 of the Superseding indictment. Also, Michael Crocker testified that he knew the purpose of the loan and, although he had been advised that Choice 2000 would repay the loan, and that he knew he, as signator, he [sic] was personally responsible for the loan.
>
> The Defendant, Jerry Pardue, testified that he acted in "good faith" upon the advice of John Kolp and at the director [sic] of the Choice 2000 Board of Directors, including Director and former President Ray Grisham and former Vice–President of Finance and Director Carlyle Buss.

The district court denied this motion as well.

On appeal, Pardue claims that the preindictment delay caused actual prejudice to him, in violation of his due process rights, because five material witnesses had died prior to his trial.

■ A district court's decision to deny a motion to dismiss for prosecutorial delay is reviewed for an abuse of discretion. *United States v. Fuzer*, 18 F.3d 517 (7th Cir.1994). An abuse of discretion occurs when no reasonable person could take the view adopted by the district court. *United States v. Van Wyhe*, 965 F.2d 528 (7th Cir.1992).

■ A defendant's primary protection against overly stale criminal charges is the applicable statute of limitations, which is the legislative limit on prosecutorial delay. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). However, the Due Process Clause of the Fifth Amendment on occasion plays a limited role in protecting defendants against egregious delay. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Canoy*, 38 F.3d 893 (7th Cir.1994). To establish that preindictment delay violated the Due Process Clause, a defendant must show that the delay caused actual and substantial prejudice to his right to a fair trial, and beyond that there must be a showing that the government delayed to gain a tactical advantage or slowed the process down for some other impermissible reason. *Marion; Lovasco*. A defendant's showing of prejudice must be in the form of concrete evidence of material harm, which can include, as is relevant here, a loss of a vital defense witness. *United States v. Van Engel*, 15 F.3d 623 (7th Cir.1993), *cert. denied*, 511 U.S. 1142, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994).

■ We have determined that a claim of prosecutorial delay involves burden shifting. Once a defendant has proven actual and substantial prejudice it is up to the government to come forward with its reasons for the delay. Those reasons are then balanced against the prejudice to the defendant to determine whether due process has been violated. *United States v. Sowa*, 34 F.3d 447 (7th Cir.1994), *cert. denied*, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *Canoy.* Our clarification of who bears the burden on these issues was not finally determined until 1994 in *Sowa*; as we explained in

judge addressed it and denied it with particulari- ty.

that case, we had not squarely confronted the issue because we had never before found actual and substantial prejudice.

■ And that is the case once again. Pardue cannot establish that he was prejudiced. His defense at trial was that he acted in good faith. That was the defense which the missing witnesses were supposedly going to help him establish. He never, however, explained in what regard their testimony would be helpful nor how he was prejudiced by its absence. As the district court observed, it is likely that, had they been alive, two of the witnesses—John Kolp and Ray Grisham—would have been indicted along with Pardue. Pardue's failure to provide any concrete basis for his claim of prejudice is a sufficient basis for the denial of his motion.

We will nevertheless flesh out briefly why it is extremely unlikely that any of the missing witnesses would have been helpful to Pardue. First we note that Pardue had a lot of baggage to overcome. He had been placed on notice by an injunction in Texas that Choice 2000 and its business practices were improper. He then took his operation to Illinois and obtained the loans at issue. He claimed that his loans were to build kiosks and set up a video computer system around the country through which to run his realty business. That never happened. Into this context we look to see who the missing witnesses were and what they knew.

Kolp is a former Federal Deposit Insurance Corporation examiner and a person who made decisions regarding Choice 2000 loans at the Mendon State Bank. Grisham was president of Choice 2000. Max Grubbs was the Choice 2000 vice-president of sales and marketing; Carlyle Buss was the vice-president of Finance. Herb Baxter was the operations manager at Lake Little Tweet. What Pardue says is that each of these people would have had vital and substantial knowledge of Pardue's activities and would have "most likely" testified on his behalf regarding his good faith and intent.

This generalized claim does not come close to meeting Pardue's burden of showing prejudice. Most likely, Kolp would have testified to his mistrust of Pardue and his worry about the Choice 2000 loans. From January

1986 until the bank closed in August 1986, the Choice 2000 checking account never had a positive balance. According to Donald Schoch, Kolp was upset about the balance in the Choice 2000 account:

I can recall in one situation ... John [Kolp] said Jerry [Pardue], where are you, we need your deposit. That was supposed to be 350,000 to come in that particular day, but it didn't show. So, there we were with the checks trying to think of some way to handle them. And that's where the notes were made and things like that. These were people that Jerry [Pardue] supplied us with when we were in a desperate situation. He knew what was going on, but he was continuously putting the pressure on us with these checks.

Furthermore, Kolp's notes revealed that he was upset about loan funds going to the Choice 2000 account:

When I returned from a two week leave of absence, I found out eventually that the funding was from brokered deposits (I had cautioned Don ... and perhaps others about brokered deposits and funding long term loans with short-term liabilities); and that also Don had booked several $350,000 loans, but instead of substantial loans being paid off, about 40% of the funds went in the Choice 2000 dda.

It is pure speculation that Kolp would have testified in support of Pardue's good faith defense. And if he had, as the district court noted, cross-examination might have pretty effectively undermined his testimony.

Grisham, another dead "witness," signed for one of the loans for $120,000. It was Grisham's daughter, a former Choice 2000 employee, who testified that during her employment at Choice 2000 she wrote a report for the review of both Pardue and her father. She had reviewed Lake Little Tweet and another Choice 2000 project, Texas Treasure. She called her report an "employee frustration report." She testified:

On a daily basis the staff of Texas Treasure is expected to perform their various appointed jobs ....... They are subject to operate a multimillion dollar facility on a budget of as low as 300 to 500 dollars a

month. They are frustrated at the fact that an employee who has been idle for six weeks has been paid 1,300 a month waiting to be told what her position is and when to physically begin her job.

Q. Who does that refer to?

A. That refers to me.

Both Grisham and Pardue were on notice that Choice 2000 had serious business problems.

As to the other witnesses, we are left in the dark about what exactly their contribution to Pardue's defense would be.

All of which leaves us far from convinced that the district court abused its discretion in denying Pardue's motions. The judgment is

AFFIRMED.